IN THE MATTER OF THE ESTATE OF JARDA ELIZABETH NELSON, sometimes known as JARDA NELSON, Deceased.
ALMA A. PETERSON, ELLEN M. KASTNER,

*Contestants and Appellants,*

vs.

A. R. McMICKEN, Executor of the Last Will of Jarda Elizabeth Nelson, Deceased, ELMER G. PETERSON and ROGENE E. PETERSON,

*Contestees and Respondents.*

(No. 2621; February 8th, 1954; 266 Pac. (2d) 238).

For the contestants and appellants the cause was submitted upon the brief of Ellery, Gray & Hickey of Cheyenne, Wyoming, and oral argument by Mr. Norman B. Gray.

For the contestees and respondents the cause was submitted upon the brief of Eph U. Johnson of Rawlins, Wyoming, Lathrop & Lathrop of Cheyenne, Wyoming, and oral argument by Mr. Carleton A. Lathrop.

452

## OPINION

BLUME, Chief Justice.

This is a contest of a will. Jarda Elizabeth Nelson died in Carbon County, Wyoming, on September 2, 1951. She had property which she had inherited from her deceased husband who died in 1939. The property

consisted of grazing and other lands amounting to more than 50,000 acres and some sheep and other personal property. She executed a will on December 28, 1944. In that will she left the main portion of that property consisting of the lands, sheep and other property connected with running the ranch to Elmer G. Peterson, her nephew. She stated that she made this provision "in recognition of the faithful services rendered in the management and care of my said sheep and livestock outfit when I was in dire need of a manager, the many sacrifices made by him in my behalf and the untiring patience and devotion shown me at all times." She left the sum of $10 to her brother, Hugo E. Peterson, who subsequently died in 1948, leaving as his heir Hugo E. Peterson, Jr. She also made some provision for her niece Rogene Peterson, sister of Elmer, which was however changed in the codicil hereinafter mentioned. She also made provision for her mother. That particular provision will be copied verbatim hereafter. She made also the following provision: "All the rest and residue of my estate, of any kind and description, real and personal, I devise and bequeath to my sister, Ellen M. Kastner." Her mother, her brother and her sister and Elmer and Rogene Peterson (the latter children of Elmer, another brother of deceased) were the only relatives who would have taken the property if the testatrix had died intestate. She appointed Clarence A. Brimmer as executor of her last will and testament.

Subsequently on March 25, 1951, she executed a codicil substituting A. R. McMicken as executor of her will and codicil. She also made a definite provision for Rogene Peterson, leaving her the sum of $20,000. She further provided that the executor might withhold all state and federal inheritance taxes found to be due on the respective shares of the beneficiaries. In other re-

spects she confirmed the will of December 28, 1944, in the following terms: "I do hereby ratify and confirm my said Will as modified, altered and changed by this Codicil, which I specifically direct be attached and affixed to my said Will dated December 28 ,1944. The will and codicil were duly admitted to probate on October 4, 1951. Thereafter on March 15, 1952, Alma A. Peterson, Ellen M. Kastner, and Hugo E. Peterson, Jr., filed a petition contesting the will and codicil upon the ground that when the will and codicil were executed Jarda Elizabeth Nelson did not have testamentary capacity and that these documents were executed because of undue influence exercised upon the person of testatrix by Elmer G. Peterson. The contest came on for trial before the court with a jury. The court submitted the following questions to the jury to be answered:

"1. Was Jarda Elizabeth Nelson, at the time of the execution of the alleged Will, dated December 28, 1944, of sound and disposing mind?"

The jury answered this by "Yes."

"2. Was Jarda Elizabeth Nelson, at the time of the execution of the alleged Codicil, dated March 25, 1951, of sound and disposing mind?"

The jury answered this question by "yes."

"3. Was Jarda Elizabeth Nelson induced to sign the alleged Will, dated December 28, 1944, by means of undue influence of Elmer Peterson?"

The jury answered this question by "No."

"4. Was Jarda Elizabeth Nelson induced to sign the alleged Codicil, dated March 25, 1951, by means of the undue influence of Elmer Peterson?"

The jury answered this question by "No."

Thereupon on March 15, 1953, judgment was entered denying the prayer of the contestants and confirming the admission to probate of the last will and codicil of

the deceased. Thereupon Alma A. Peterson and Ellen M. Kastner appealed the case to this court by direct appeal.

The record in this case consists of considerably more than 1000 typewriten pages. The evidence is voluminous and to keep this opinion within reasonable compass, it will, of course, be necessary to considerably condense the testimony, leaving, however, if possible, a fair presentation of the facts in the case.

1.   Susceptibility to undue influence.

Contestants in the oral argument in this court abandoned the claim that testatrix did not have testamentary capacity. They now rely upon the fact that the will in question in this case is invalid on account of undue influence upon testatrix exercised by Elmer G. Peterson, nephew of the testatrix. They introduced one class of evidence which they consider as showing susceptibility of such undue influence. They summarize that evidence in their brief somewhat as follows:

The testatrix was born in Leadville, Colorado, on September 13, 1889. She was the eldest of four children, the other children consisting of two brothers, Elmer and Hugo, and a sister Ellen, who subsequently married Kastner. The testatrix became a nurse and at one time became superintendent of the hospital at Rawlins. During that period she was immaculately neat and clean. In 1916, she married Andy Nelson, the operator of a large sheep outfit with headquarters at Walcott, Wyoming. A fine house was built at Walcott which the Nelsons occupied for some time. About 1934, or before, testatrix became afflicted with arthritis and that affliction increased as time went along. She told one of the witnesses in the case that her affliction may have started with a stroke. At that time she was still fairly neat but not careful about her personal appearance. She

became irritable and cross and would quarrel with her husband. While in the office of Clarence Brimmer, she would at times shout and pound the table. By the year 1944, she had grown worse with her arthritis, at times suffering excruciating pain. She was terribly crippled and had deformities all over her body, hands, feet and back, and was unable to move about easily. By the year 1944 she had become slovenly, untidy and unclean about her clothes and her person. She would not wash her hair; her clothes and hose were worn and ragged. At about this time she also had a Mexican houseboy about 30 or 35 years old doing house work for her and cooking and looking after her personal needs such as taking her to the toilet, giving her baths and one time he helped Dr. Jeffrey give her an enema. (How often the Mexican so helped her does not appear.) Testatrix also suffered from varicose veins. This would cause itching and she would scratch the area and then without washing her hands, would skim cream from milk in a pan by running her fingers around the edge of the pan. (It does not appear how often that occurred.) By the year 1934, testatrix and her husband had quit living together as husband and wife and she would not permit him to sleep in the big house because he and his dog were dirty. She raised cain about his smoking a pipe in the house and having liquor there. He moved to a log cabin located about 100 yards from the big house. The log cabin did not have modern facilities. Her husband died in 1939. Testatrix for a while continued to sleep in the big house but cooked the meals in the log cabin. She had wrapped all the furniture, except the bedroom furniture, with paper and burlap and it stayed that way for years. She finally moved out of the big house and lived entirely in the log cabin. During this time she had lost all sense of modesty. (Argumentative.) The Mexican houseboy performed the most intimate tasks for her. She would not pull the curtains in

the big house at night and could be seen through the windows in the nude. (How often this occurred does not appear.) She would go out into the fields all day watching the men in whatever they might be doing. During this period, according to the witness Balenovic, she had become very erratic and inconsistent. She would agree to the sale of the ranch and then change her mind. (This apparently was largely because she was afraid that the Government would take a large part of the purchase money.) She became penurious and would not go to the hospital and would not employ a nurse because, for one thing, it cost too much. She refused to raise the wages of her men. She was stubborn in the extreme. She was also a schemer. She was also eccentric. The witness, Mrs. Potter, a nurse, stated that in 1944, the mental condition of testatrix was not good and she was not a normal person. She died from auricular fibrillation in September 1951.

Counsel, however, state in their brief "Even though this situation existed, it appears from the record that she was able to run this rather large sheep outfit. She gave orders with respect to work to be performed, hired and fired men, kept the time of her men and paid them by check, purchased groceries and supplies and in general handled her own business affairs. She seemed to know what property she owned and who her relatives were. It was difficult for her to get around to oversee the ranch but her help would put her in a pickup truck and she was out over the ranch most every day in the summer particularly when haying was on."

One Joe Cruz was a witness for the contestants. He testified that the testatrix knew everything about her sheep and cattle; that she always surprised the witness by the knowledge about her landmarks and her number of sheep and her number of cattle and he often watched her stand around and count the sheep along with the

foreman and along with the rest of the men. Testatrix knew right well what she was doing all the time and she was competent and very appreciative of the work which witness did.

The witness C. L. Bates, also a witness for the contestants, testified that testatrix gave him a check in 1944. That at that time she absolutely knew what she was doing and she was absolutely competent. In 1950 the testatrix recognized the witness; her memory was good; she knew who her relatives were and what property she had; she gave the exact number of sheep and the exact number of acres of land that she owned. Testatrix enjoyed visiting with the witness and talked about other things besides the ranch and sheep, such as her general health.

Clarence A. Brimmer, who was the attorney for the Nelsons for many years, also was a witness for the contestants. He prepared the will in 1944. He stated the testatrix knew absolutely what she was doing. At that time she was absolutely mentally competent. No one forced her to sign the will; no undue influence of any kind was used upon her to the knowledge of the witness. She gave him the instructions of how she wanted her will prepared and no other person was present when she gave the instructions. She ran her own outfit and was not easily influenced.

Some twenty or more witnesses testified on behalf of the contestees herein. We shall give short extracts of the testimony given by some of these witnesses. James Collins testified that her mental condition was all right, the same as anybody else; that she had a nice, sunny disposition. All the time that he knew her she was of sound mind, knew what she was doing and knew her property. She would order supplies, handle sale of lambs, and knew her horses by sight and by their

names. Albert L. Welton, Jr., an adjoining rancher, testified that he had business dealings with her nearly every year. All the time he knew testatrix her mental condition was very good. In fact, it always seemed miraculous how alert she was in view of her physical condition. Witness was sure she was not easily influenced. She had a mind of her own and she knew what she wanted. Witness Crone, an adjoining ranch owner and graduate civil engineer, testified he had known testatrix since 1916 and had done business with her. She was a good neighbor, never had any trouble with her in any way. Her sheep outfit was run as well as the average. Testatrix made the final decision on all matters pertaining to her ranch and sheep even when Elmer G. Peterson was foreman. All the time witness knew testatrix she was perfectly normal; she was competent; she knew her property and was not insane. Never heard of anybody trying to get her to do anything. Mrs. Lora Crone, an adjoining neighbor, called on testatrix frequently since 1946. Testatrix was very sociable and always enjoyed a good visit. She was alert and definitely knew what she was doing and was her own business manager. The witness Ault, also an adjoining rancher, testified he had known testatrix since 1917 and she was always competent. He never saw Elmer G. Peterson try to influence her in any way. He would not say she was peculiar in any way other than what any of us might be under the same circumstances she was and the way she was crippled. She had no peculiarities mentally. Gertrude Anderson, apparently living at Walcott, visited back and forth with the testatrix. Testatrix did not dress any differently than anybody else. Witness never saw any one that was any more normal than testatrix was. She was sane, her memory was good. The witness Williams had known her since 1930 and testified that testatrix absolutely knew what she was doing. She had a good memory.

There was not a bit of change in her mental condition from the first time he met her until the last time he saw her before her death. The witness Shupp had known her since 1939. Shortly before testatrix died her mental condition was very good, she was elert. Testatrix seemed to think that Ellen Kastner did not seem to like her. She seemed to be well educated and had a good memory. Sarah Comstock knew testatrix since 1930 and up to the time of her death testatrix was competent and knew what she was doing. She was happy all the time and jolly. She treated everybody right. She had a wonderful memory. She always was the boss of her outfit, and she gave the orders. Nellie Parker knew testatrix for more than twenty years and worked for her part of the time. Witness made many dresses for the deceased and testatrix always had good clothes. Her mental condition in July 1951 was fine. She was keeping the time of the men working for her and she was very competent. Witness did not notice any change in her mentality from the first time she knew her until the last time. Testatrix had a wonderful memory. She knew every Mexican man and she knew every horse on the place by name. Mrs. Gray testified that she knew testatrix since 1948. Testatrix was her own boss at all times. She gave Elmer Peterson orders lots of times. Testatrix was very intelligent, she was sane and had a wonderful memory.

We are somewhat at a loss to know how counsel for contestants, in view of the foregoing testimony, find much evidence of the susceptibility to undue influence on the part of the testatrix. Counsel rely in the main on her physical condition, which, may, or may not seriously affect mental condition to the point of susceptibility to undue influence. In the case at bar the negative seems to have been true, although we have no doubt that the physical ailment had some effect and

made her somewhat different than she would have been in the absence thereof, and evidently caused some people to consider her erratic and eccentric. Counsel also rely on her want of neatness and modesty. However, it could hardly be expected that a woman married for many years, living on a ranch, afflicted physically as she was, would be as neat and tidy and modest as a young and blushing bride. That she was seen in the nude is not quite as shocking as counsel would have us believe, in view of the fact that it was difficult for her to move about and lower her shades, let alone the fact that one ordinarily does not expect another to peep into his windows. That she engaged a Mexican to help her in taking baths may have a number of explanations. Testatrix is not here to defend herself. It shows, if nothing else that testatrix was not as dirty as it is sought to have us believe. That she shouted and pounded the table in the office of Clarence Brimmer doubtless embarrassed him. But doing so is not altogether unknown, without showing any deterioration in mentality. We must make allowances for the differences in human nature.

It is said in 1 Page on Wills, § 148, p. 303 (Lifetime Edition) : "Eccentricity has no effect on testamentary capacity; and the will of persons who are highly eccentric, and in some cases eccentric to the verge of insanity, have been upheld. * * * The fact that the testator was filthy, forgetful, and eccentric, or that he was miserly and filthy, * * * or that he was filthy, frequently refused to eat, and would lie in bed with his clothes on * * * or that he was inattentive * * * does not establish lack of capacity."

We think that a like rule applies in so far as undue influence is concerned. It is pointed out that a contract of employment entered into between testatrix and Elmer Peterson in 1951 provides that Elmer would

manage the ranch in view of the fact that testatrix had become physically incapable of managing her property. So counsel argue that this shows that she had a weakened mentality. We do not think that is necessarily true. There is, or may be, a marked difference between mental and physical infirmity. Taking the testimony as a whole, we get the impression that testatrix, particularly in view of her physical condition, was a woman of vigorous and unusually strong character mentally; that she knew all of her property and relatives; that she was bright, alert, fully cognizant of everything about her, running her own business and that with great intelligence; that she was not easily influenced by anyone against her wishes. The detailed testimony of A. R. McMicken, Eph Johnson, John W. France and Dr. McNamara who were present at the time of the execution of the codicil—two of them witnesses thereto—seems rather persuasive that at that time the testatrix did not have a weakened mind and that she executed the codicil as her free and voluntary act without any compulsion. It is difficult to see, in view of the overwhelming evidence in this case, how the jury could have come to a different conclusion. But, even if it were assumed that testatrix was susceptible to undue influence, that fact would be wholly immaterial herein unless it were connected up by evidence of actual undue influence exercised upon her—a point that will be considered presently.

2. Unnatural will.

Contestants claim that the will in question makes an unnatural disposition of the property of the deceased. The second class of evidence introduced in the case bears on that point. The property was inventoried at about $640,000. It is common knowledge that livestock interests have suffered severely in the last two years or more. We do not know the percentage. Let us say 30%.

The ranch is mortgaged for $80,000. Federal estate taxes will amount to about $150,000. Current debt was shown at $5,000. A claim of $21,000 was filed by Brimmer and Bible. Then there are to be paid fees for the executor and attorneys. If the testatrix had disposed of her property fairly equally among her relatives, it would, of course, have been absolutely necessary to sell the ranch property, and that is probably, judging from the record as a whole, the last thing which the testatrix would have wanted. It was not an unnatural wish to prevent the property from falling into the hands of strangers, and Elmer Peterson is the only near relative able to take over the ranch and run it. Furthermore, Elmer Peterson is the son of the favorite brother of testatrix (the brother Elmer died in 1933). Elmer, himself, worked on the ranch when but a boy commencing about 1934 and did so for a number of years. The testatrix being without children herself not unnaturally became fond of the boy preferring him to all others and making him, in her judgment, the main object of her bounty. We said in the case of In re Johnston's Estate, 63 Wyo. 332, 181 P. (2d) 611, 616, quoting from In re Miller's Estate, 10 Wash. (2d) 258, 116 P. (2d) 526, 531, as follows: " 'A will is unnatural when it is contrary to what the testator, from his known views, feelings and intentions would have been expected to make. If the will is in accordance with such views it is not unnatural however much it may differ from ordinary actions of men in similar circumstances'." See also In re Lavelle's Estate, Utah, 248 P. (2d) 372. In view of her relation to Elmer, the will, it would seem, was in accordance with her views, feelings and intentions.

So we shall consider the other relatives. In February 1951, testatrix bought, it seems, a Financial Industrial Fund of $12,000, the beneficiaries of which are the

three children of Ellen Kastner, sister of testatrix, along with Elmer and Rogene Peterson. Her brother Hugo died in 1948. She had loaned him the sum of $2,000 to buy an interest in the ranch. They did not get along well. He had broken or twisted her wrist in a quarrel. She bought him out at $60,000. The minor son of Hugo had at least $36,000. So that as far as they are concerned, the will cannot be said to be an unnatural one. The deceased had a living mother, nearing 80 years of age, when the will of 1944 was made and about 85 years old when the codicil of 1951 was made. Testatrix loved her mother. Not much is known as to how the mother lived for a number of years. She acquired a house in Rawlins in 1923, worth about $8,000 to $10,000, which she deeded to her daughter Ellen Kastner in October 1943, but which was recorded much later. She received some $11,000 in 1948 as the result of an insurance policy in her favor and which was invested in Government bonds. She also had a limited number of shares in the Financial Industrial Fund. So far as we can tell from the record, she had an income of $720 from rentals in 1951 besides some other small income. We find in the record that in 1942 testatrix paid her mother $600; in 1944, $300 and in the same year an additional $600. These sums were paid for wages. It can hardly be said with counsel for contestants that testatrix disinherited her mother. She made a provision in the will, kept intact by the codicil, to the following effect: "I hereby order and direct that my executor hereinafter named, during the administration of my estate, shall see that my Mother, Alma A. Peterson at all times is provided for and at no time shall be in want of food, clothing, shelter, medicines, medical, hospital and nursing care and attention and I do give for said purposes the money needed in providing for the same. I do further request that if no provision is hereafter made for the care and maintenance of my

Mother after my estate is closed and settled, that then my nephew Elmer G. Peterson personally assume said obligation and at all times see that her needs are provided for." It is not claimed that this provision is not enforceable. We hardly think that in view of the advanced age of the mother, the provision of the will in her favor was inappropriate and showed a lack of love and respect.

Rogene Peterson, sister of Elmer, was left $20,000 in the codicil. She is not complaining. So that leaves for consideration Ellen Kastner, sister of the deceased. The latter testified at length to the effect that she was at all times on a sisterly footing with the testatrix. It may be admitted for the purpose of this case that she was fairly friendly with testatrix at all times although the record shows that the testatrix was not particularly fond of Ellen. The latter was out of the state for many years and did not come to Rawlins until 1940. Her children, so far as the record shows, paid no attention to the testatrix and the latter complained that Ellen did not pay her very much attention and in fact feared, as turned out to be true, that Ellen would attempt to break her will. Ellen Kastner was not penniless. She had property when testatrix died valued at some $14,000 in addition to the house which she received from her mother. In 1951 she had an income of $2,240 as salary; $1,000 received as support payments from the Veterans Administration; $600 from the Red Cross; $1,494.56 income from a Financial Industrial Fund, a total of about $5,400 in addition to some other small income. She was made the residuary legatee in the will, and might, according to counsel for appellants under favorable circumstances, receive approximately $19,000. They say, however, that she may not receive anything, since the residuary estate could, under the will, be used in running the sheep. We do not know

that to be true. In any event testatrix remembered her sister and showed her good will toward her. There was no duty on testatrix to make an equal division of her property among her relations. Thomas v. Thomas' Adm'r. 258 Ky. 236, 79 S.W. (2d) 982.

These facts must be considered in the light of the rules of law applicable on the subject before us. In re Johnston's Estate, supra, we upheld a will which disinherited a sister in favor of a stranger. The court in the case of In re Goist's Estate, 146 Neb. 1, 18 N.W. (2d) 513, 521, 522, quoting from a previous case stated as follows: " 'No right of the citizen is more valued than the power to dispose of his property by will. No right is more solemnly assured to him by the law. Nor does it depend in any sense upon the judicious exercise of that right. It rarely happens that a man bequeaths his estate to the entire satisfaction of either his family or friends. The law wisely secures equality of distribution where a man dies intestate, but the very object of a will is to produce inequality * * *. In this country a man's prejudices form a part of his liberty. He has a right to them. He may be unjust to his children or relatives. He is entitled to the control of his property while living, and by will to direct its use after his death, subject only to such restrictions as are imposed by law. Where a man has sufficient memory and understanding to make a will, and such instrument is not the result of undue influence, it is not to be set aside without sufficient evidence, nor upon sentimental notions of equality. * * *' Isaac V. Halderman, 76 Neb. 823, 107 N.W. 1016, 1019." In 57 Am. Jur. § 150, p. 136, it is stated as follows: "In modern times, unless a statute otherwise provides, or there is a binding contract to the contrary, a testator with the requisite capacity, observing the formalities prescribed by statute for the execution of wills, may disinherit his children or other per-

sons who would take his estate by descent in case of intestacy, without mentioning them or disclosing a reason for not favoring them with a bequest. Next of kin and relatives, no matter how near they may be, cannot be said to have any natural right to the estate of the testator which can be asserted against the legally executed will of the latter. A father may exclude his son from all share in his estate provided the estate is given to someone else." In 1 Page On Wills, supra, pp. 73, 74, 75, 76, the author states: "The fact that the will is unjust and unnatural does not render it invalid. In the absence of specific statutory restrictions, testator may alter the statutory course of descent without rendering his will invalid, and may disinherit those who would take by descent if it were not for such will, such as children, acknowledged illegitimate children, although by statute they would take by descent in case though by statute they would take by descent in case of intestacy, adopted children, grandchildren, or brothers and sisters, or nephews and nieces, or parents, no matter how unjust his exclusion of his hears may be; and he may give all his property to a stranger to his blood." In the case of In re Hill's Estate, Oregon, 256 P. (2d) 735, 738, the supreme court of Oregon states: "Many a contestant's high hopes, destined to disappointment, spring from a carelessly bandied use of that phrase which refers to them as the 'natural objects of the testator's bounty.' Too many seem to garner therefrom a rule of law not present nor to be implied. It confers no inferential rights, nor indeed any rights, to take from one dying testate. It compels no duty upon the part of a testator to make any provision for those comprehended by its words."

We recognized the rule above stated in In re Lane's Estate, 50 Wyo. 119, 58 P. (2d) 415, and in Branson v. Roelofsz, 52 Wyo. 101, 70 P. (2d) 589, although on

account of the peculiar facts in that case, we held that it was not error to refuse an instruction stating the rule above mentioned without qualification.

3. Exercise of undue influence.

We now come to the most fundamental question in the case, namely, whether or not undue influence was exercised upon the testatrix by Elmer G. Peterson as claimed by the contestants. Unless such influence was actually exercised, it would be immaterial as to whether or not the will disposed of the property in an unnatural manner, in view of the fact, as heretofore stated, that it is admitted the testatrix had testamentary capacity. In connection with the will of 1944, it appears that Elmer Peterson drove the testatrix to the office of Clarence Brimmer. She was unable to climb the stairs to go to the office of the attorney. So Clarence Brimmer was summoned to go down to the automobile in which the testatrix was seated. He did so and no one else was present when the testatrix told Clarence Brimmer of what provisions she wanted to make in the will. The will was drafted subsequently by Mr. Brimmer and he and some witnesses drove to Walcott the next day where the will was duly executed at that time and Elmer Peterson was not present. In this connection, counsel for appellants say that there is testimony that it was the influence of Elmer Peterson which brought about the will of 1944, in view of the fact that Ellen Kastner testified that she saw testatrix in front of the bank and that at that time testatrix told her that Elmer had insisted upon her making a will before she left for Excelsior Springs, Missouri. Ellen Kastner was not corroborated in this by Clarence Brimmer as she should have been if her testimony is true, and she was contradicted by Elmer Peterson who in turn was corroborated by Sarah Comstock. However that may be, it does not appear that Elmer insisted upon any particular

provisions in the will and simply to suggest or insist that a testator should make a will would seem to be of little if any importance. In any event, the testimony was incompetent to prove that any actual influence was exercised by Elmer Peterson, since it was not a part of the res gestae. 6 Wigmore on Evidence, 3rd Ed., § 1738. 2 Page on Wills, § 848, p. 672, and numerous cases cited. In re Gleason's Estate, 164 Cal. 756, 130 P. 872, 874, the court stated: "The external facts constituting the exercise of undue influence must be established by other evidence than the declaration of the testator. His declarations are incompetent to show either that the influence was exercised, or that it affected his actions, and are inadmissible, except as they may illustrate his mental state, * * *. His statement of the effect that an act or suggestion of another produced upon him at some previous time is, however, only hearsay." See also Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138, 1145.

The codicil of 1951 was drafted by A. R. McMicken, who was employed as the attorney for testatrix as early as November 1950 in connection with the claim of Brimmer and Bible. He knew nothing about her will until about March 9, 1951, when Joe Collins, an employee of testatrix, brought him the will of 1944, having obtained it from Clarence Brimmer, who had had the custody of it till that time. Joe Collins told Mr. McMicken that testatrix wanted to see him to get him to persuade Elmer Peterson to return to her employ. Mr. McMicken thereafter went to see testatrix at her ranch, and talked about Elmer returning as mentioned. She then told Mr. McMicken that she wanted to make some changes in her will. The codicil was drafted with a great deal of care, and after the changes had been talked over in detail during a whole day's conference. Mr. McMicken and testatrix were alone. The return of Elmer to her employment was also discussed. Elmer

had quit his employment with testatrix in the fall of 1949 on account of the fact that testatrix was not paying him sufficient salary. He thereafter went into business for himself, running a filling station and made in the neighborhood of $11,000 per annum. Testatrix wanted him to come back into her employment and he hesitated to do so and several times refused to enter into a contract of employment. But he finally met with testatrix and Mr. McMicken and it was agreed that he should re-enter the employment of testatrix as manager at a salary of $500 per month plus 20% of the profits. But after again talking with his wife, he again refused to sign the contract drafted by Mr. McMicken. The latter informed the testatrix of that refusal at the time when the codicil was signed and he told testatrix at that time she could change the provisions of the will and codicil about leaving anything to Elmer Peterson. Testatrix stated that she wanted him to have the ranch and would not make any changes but asked Mr. Mc-Micken to see Elmer again and persuade him to change his mind. After the codicil was executed, Mr. McMicken stopped at Elmer's filling station and persuaded Elmer to sign the contract prepared by him.

Counsel for contestants say that undue influence on the part of Elmer might be inferred from the fact that he signed the contract for re-employment within an hour after the codicil was executed. They say: "The jury, under proper instructions, might well have found that Elmer brought about the Codicil also by insisting that it be done prior to the time he would go back to work for his aunt on the very ranch which under the provisions of the Codicil was to become his upon her death." We find no evidence to that effect. Elmer Peterson had, about 1945, been informed of the 1944 will and the provisions therein in his favor, so that there was no necessity so far as we can see for him to

wait until the codicil had been signed, unless, perchance he was afraid that she might change her will. But according to Mr. McMicken he did not know that she was executing a codicil. If it can be said that any influence was exercised by one person upon another in this connection, it would seem that it was exercised on the part of testatrix, through Mr. McMicken, upon Elmer Peterson rather than the reverse. Mr. McMicken testified as to what took place when he stopped to see Elmer after the codicil was executed. That testimony is as follows:

"Q. What did you say to him? A. Well, I told him, 'Your aunt sent me back again now to see if you would sign this contract.' I told him she said she wanted him. I told him again, as I previously stated, that I thought he owed it to her, she was—that he was the only male relative she had to run this outfit and if he didn't take over pretty quick it would go to pieces. We discussed it for quite a while and he didn't want to go, and so on. I told him that she had given him everything that he had asked for and I thought the contract was fair. I made this further remark that, 'You can't stay at this filling station forever, you got these two little baby girls and you are going to have to get them in school, and I don't think your environment is right, you are selling beer over this counter. I think you are going to have to move and I think this would be a good time for you to make a change.' I got him to sign the contract and I filled in the date, the 25th, and he signed his name under each of three of them where Mrs. Nelson had signed it, and I left him the original, went back out to the car and went to Rawlins."

Counsel for contestants say that there is a suspicious circumstance in this case in that Elmer did not immediately advise the mother and sister of testatrix of the

serious condition of the testatrix when she died on September 2, 1951. And that the mother and sister did not hear of her death until the next morning through the hired help at the ranch. We cannot see the force of the argument. The testatrix became seriously ill on the evening of September 1, 1951, and Elmer immediately called Mr. McMicken and asked him to send a doctor to take care of testatrix. That was done. To summon the doctor was the important thing at the time. Counsel ask the question: "Is such conduct in keeping with a clear conscience and a feeling free from wrong-doing on the part of Elmer?" We must confess we do not understand how the matter just referred to has anything to do with any undue influence exerted by Elmer Peterson, as claimed.

Counsel say that a further suspicious circumstance is that Elmer was the only one of the lawful heirs of the testatrix who knew what was in the will, and he knew it in 1945. Counsel think that he ought to have informed the other heirs. It seems that Clarence Brimmer informed Elmer of the fact that the ranch interests were left to him. Why he should have informed the others is not at all clear to us. For aught that he may have known, Mr. Brimmer might have informed the other heirs of the contents of the will just as he informed Elmer Peterson.

Counsel for contestants also claim that the matter of the witnesses to the codicil creates doubt. Just in what connection they do not say. Apparently they refer to the fact that Dr. McNamara was summed to see the testatrix at the time when the codicil in question herein was executed. The explanation of that is very simple. The testatrix had told Mr. McMicken to attend to the matter of the exercise of the codicil as she feared that Ellen Kastner would attempt to break her will. So it

was the suggestion of Mr. McMicken, agreed to by the testatrix, that in order to put her mental capacity beyond any question, a physician should be summoned to examine her for the purpose of determining whether or not she was a competent person to execute the codicil. Under the circumstances there was nothing peculiar or strange that Dr. McNamara examined the testatrix before and at the time that she executed the codicil. According to the testimony of Mr. McMicken, Elmer Peterson knew nothing about the codicil and he was not present when it was signed. It was executed in the presence of Dr. McNamara and John W. France as well as Eph Johnson and Mr. McMicken, all of whom testified that she was competent to execute the codicil, and knew what she was doing. The witness France testified among other things: "She mentioned that she knew entirely what she was doing, and that she was acting under no duress or anything of that nature." That statement was made as part of the res gestae. We are unable to find any evidence in the case which tends to show directly or indirectly that any undue influence was exercised by Elmer Peterson in connection with the original will in 1944 or the codicil of 1951. Counsel for contestants, however, contend that the jury could have found the existence of undue influence by reason of a presumption arising from a combination of facts as stated in Instruction B, asked by them, but refused by the court. It is, therefore, necessary for us to examine that instruction and determine whether or not it was error not to give it.

4. Instruction on presumptions.

Counsel for contestants asked the court to give the following Instruction B.

"You are instructed that if you find a confidential relation existed between the testatrix and Elmer Peter-

son no presumption of undue influence is raised and the burden of proof is not shifted by the mere fact that a beneficiary under the Will occupies as regards the textatrix a confidential or fiduciary relation such as that of a business manager .However, if, in addition to a confidential relation between testatrix and Elmer Peterson, you should further find that there exists suspicious circumstances such as the fact that the beneficiary took part in the procuring of the Will or that the testatrix was weak-minded or in frail health and partly susceptible to influence, or that the provisions of the Will are unnatural and unjust, then you are instructed that undue influence is presumed and the burden of proof shifted to the contestees to require the beneficiary to produce evidence which at least balances that of the contestant."

The court refused to give that instruction, but instead gave Instruction No. 9 reading as follows:

"In determining whether or not any undue influence was exercised over the testatrix on December 28, 1944, or on March 25, 1951, you may consider, among other things, the following factors:

(a) Whether or not the person or persons claimed to have exercised undue influence were in confidential or fiduciary relationships such as employee, business manager, and the like, and in addition thereto

(b) Whether or not the testatrix was weak-minded, or in frail health, or particularly susceptible to undue influence, or

(c) Whether or not the provisions of the Will are unnatural."

It may be noted that the court in its instruction mentioned the same elements of influence as Instruction B. The objection made by contestants is that the court did not go far enough, but should have stated, as in the

asked instruction, that if the elements existed, then it followed as a matter of law that a presumption of undue influence existed which had to be met by evidence to put the presumption in equipoise.

The instruction is based, in the first place upon the assumption that a confidential relationship existed between the testatrix and Elmer Peterson. We doubt that the evidence warrants such finding even as to the will of 1944. It is held in Hyde v. Norris, 250 Ala. 518, 35 So. (2d) 181, that the confidential relationship must be a *dominant* confidential relationship. Blood relationship is not in itself a confidential relation. 57 Am. Jur. 287. In re Lawrence's Estate, 286 Pa. 58, 132 A. 786, it was held that where a brother was the main beneficiary and he managed the farm of testator, but the latter looked after his own wants, even active participation in the making of the will did not cast on the beneficiary the burden of showing lack of undue influence as it would in the case of a stranger. In re Douglass' Estate, 162 Pa. 567, 29 A. 715, testator had several farms managed by a superintendent. He gave one of his farms to the superintendent. The latter had nothing to do with the execution of the will, and the relationship between him and the testator was no more than usual between employer and employee. It was held that the burden was not shifted to the superintendent to show want of undue influence. The evidence in the case at bar would seem to show a situation in 1944 very similar to that in the cases cited. In any event, Elmer Peterson was not in the employ of testatrix when the codicil of 1951 was executed. He had done a few errands for her in seeing Mr. McMicken for her in connection with the claim of Brimmer and Bible and about changing the bank account of testatrix to another bank. That does not show any confidential relation. Even if the will of 1944 was invalid by reason

of undue influence, it was validated in 1951 by the codicil when no undue influence existed. 68 C.J. 862, 863. In re Hesse's Estate, 62 Ariz. 273, 157 P. (2d) 347, 351. Undue influence must be such as destroys free agency and thereby substitutes the will of another for that of the testator. Cook v. Bolduc, 24 Wyo. 281, 157 P. 580, 158 P. 266. In re Anderson's Estate, Wyo. 255 P. (2d) 983. Elmer had nothing to do with the execution of the codicil of 1951. Hence an instruction based on the theory that a confidential relationship might have been found by the jury at that time would be wholly unwarranted, and the asked Instruction B was properly refused for that reason alone.

Let us, however, examine the other statements contained in the asked instruction. It is stated in 28 R.C.L. § 100, p. 146, as follows: "It is the generally accepted view that the mere existence of confidential relations between a testator and a benefiiciary under his will does not raise a presumption that the beneficiary has exercised undue influence over the testator, and does not cast upon the beneficiary the burden of disproving undue influence. Those consequences follow only when the beneficiary has been actively concerned in some way with the preparation or execution of the will." It may be noted that activity of the beneficiary is required. The same rule is stated in the annotations in 66 A.L.R. 228, and 154 A.L.R. 583, citing scores of cases. Counsel call this the minority rule, seem to think that it is out-dated and is superseded by the text in Corpus Juris and American Jurisprudence. The text in 68 C.J. 759 to 761 is as follows: "However, it is the general rule in practically all jurisdictions that undue influence is presumed and the burden of proof shifted so as to require the beneficiary to produce evidence which at least balances that of the contestant, when, in addition to the confidential relation, there exist sus-

picious circumstances, such as the fact that the beneficiary took part in the preparation of procuring of the will, or actually drafted it or assisted in its execution, or *that the testator was weak-minded or in frail health and particularly susceptible to influence, or that the provisions of the will are unnatural and unjust."* (Italics supplied.) This text differs from that in Ruling Case Law in the italicized portion. The text is substantially repeated in 57 Am. Jur. 280, which, however, refers to sections 396 and 398, pages 285 and 286. The rule when an unnatural will is involved is stated more cautiously in 57 Am. Jur. 286 as follows:

"But the circumstances of inequality or unfairness in the will, coupled with a confidential relation between the testator and a favored beneficiary, as *a result of which the beneficiary had dominated and controlled the testator for some time,* has been held sufficient to raise a presumption of undue influence. * * * " (Italics supplied.) The same statement is found in 68 C.J. 1099, which also states that if the proponent of the will does not produce any evidence, the court should not rule as a matter of law that undue influence has been established.

We have read all the cases cited in Corpus Juris and American Jurisprudence, bearing on the italicized portion in Corpus Juris. We are unable to say that the text is not sustained by decisions of some of the courts, although, as will appear later, it is probable that some of the decisions have been superseded by later decisions in the respective jurisdictions. Nor can we say that it is the prevailing rule. The asked instruction speaks of "partly susceptible" which counsel for contestee criticize as incorrect. It is clear that what was meant was "particularly susceptible," following the text in Corpus Juris, and we shall disregard the slight mistake. Confidential relationship and weakened physical

condition do not give rise to a presumption of undue influence, unless perchance the weakened bodily condition is so extreme as to make testator "particularly susceptible to undue influence." In re Lavelle's Estate, Utah, 248 P. (2d) 372. In re King's Estate, 369 Pa. 523, 87 A. (2d) 469, 473, where no weakened intellect was shown, the court stated:

"Nor is the burden of proof placed upon a legatee, in the case of a confidential relation, unless it be shown that he was instrumental in procuring the legacy. Where there is no evidence that the beneficiary solicited the bequest herself or wrote the will or procured it to be written, or that her advice was sought or taken, the existence of intimate friendly relations between the testatrix and beneficiary, such as living with her, nursing her and managing her business do not import undue influence or shift the burden of proof."

None of the cases cited in Corpus Juris and American Jurisprudence hold that the court should tell the jury that the combination of facts stated in asked Instruction B raised, as a matter of law, a presumption of undue influence, except the case of Moore v. Spier, 80 Ala. 129, where the court held that the jury should be instructed that if the testator had a weakened intellect and confidential relation existed, these factors gave rise to a presumption of undue influence. As will be seen later, it is doubtful that the case is now the law in Alabama. As to whether or not the rule of Ruling Case Law is superseded by the text in Corpus Juris may be judged more accurately after an examination of cases from various jurisdictions. It must be remembered that a confidential relation may be loose or close, may not show any dominance on the part of the beneficiary, and may have no relation to the will at all. Weakness of mind may be of small or large degree. Unnaturalness of a will may be accentuated or may exist

in but small degree, or not at all, depending on the view taken by men. And it may well be questioned whether the same instruction should be given under each of these varying circumstances. For example it is held that only when a will is grossly unreasonable in its provisions and plainly inconsistent with testator's duty to his family will the inequality have any effect on the question of undue influence. Central Hanover Bank & Trust Co. v. Froment, 114 Vt. 523, 49 A. (2d) 111; In re Le Gault's Estate, 99 Or. 621, 196 P. 254. It is clear that asked Instruction B ignores the rule stated in these cases entirely. In re Kajewski's Estate, 134 Neb. 485, 279 N.W. 185, the court approved of the text in Corpus Juris heretofore cited. The statement to that effect was mostly dictum. It was held in that case that since the evidence failed to disclose that the beneficiary was active in procuring a will, it was error to submit the case to the jury on the question of undue influence. If we should follow that case we should have to say, we think, that the question of undue influence should not in the case at bar have been submitted to the jury at all. The rule in Nebraska according to late rulings is that to warrant the rejection of a will by reason of undue influence it is necessary to show (1) that the testator was subject to such influence; (2) that the opportunity to exercise it existed; (3) that there was a disposition to exercise it; (4) that the result appears to be the result of such influence. A will contestant must produce evidence to prove each of these elements as a prerequisite to have the case submitted to the jury on the question of undue influence. In re Hagan's Estate, 143 Neb. 459, 9 N.W. (2d) 794, 154 A.L.R. 573; In re Bainbridge's Estate, 151 Neb. 142, 36 N.W. (2d) 625. In view of the fact that particularly the third element can seldom be proven except by facts showing participation in the procuring of the will, the rule seems but little different from the California rule here-

after mentioned. The rule in Wisconsin seems to be the same as that in Nebraska. In re Stanley's Will, 226 Wis. 354, 276 N.W. 353; In re Sowka's Will, 247 Wis. 498, 19 N.W. (2d) 898.

In the case of In re Llewellyn's Estate, 83 Cal. App. (2d) 534, 189 P. (2d) 822, 839, 191 P. (2d) 419, the court stated:

"Before there is imposed upon the proponent of a will the obligation of presenting evidence of volition, and before the question as to undue influence becomes one of fact for determination by a jury, there must be evidence, the probative force of which establishes (1) the relations between the one charged with exercising the undue influence and the decedent affording the former an opportunity to control the testamentary act; (2) that the decedent's condition was such as to permit of a subversion of his freedom of will; (3) that there was activity on the part of the person charged with exercising undue influence; and (4) that such person unduly profited as beneficiary under the will. Estate of Graves, 202 Cal. 258, 262, 259 P. 935; Estate of Hampton, 39 Cal. App. 2d 488, 498, 103 P. 2d. 611. It is also the law that evidence must be produced that pressure was brought to bear directly upon the testamentary act. Estate of Arnold, 16 Cal. 2d 573, 577, 107 P. 2d 25."

To the same effect are In re Hull's Estate, 63 Cal. App. (2d) 135, 146 P. (2d) 242, and other cases. In re Doty's Estate, 89 Cal. App. (2d) 747, 201 P. (2d) 823, 829, citing other cases the court stated: "In the absence of evidence of activity on the part of the beneficiaries, or either of them, no presumption arose of the exertion of undue influence by them." To that effect, also, is In re Lingenfelter's Estate, Cal. App., 234 P. (2d) 125, 129.

In Kahalley v. Kahalley, 248 Ala. 624, 28 So. (2d) 792, 795, the court stated:

"We have observed that in order to raise the presumption of undue influence of the beneficiary and cast the

burden on her of showing the contrary, there must have been shown an active interference on her part in procuring the execution of the will, the mere activity and interest in following and complying with testator's instructions or directions being insufficient to this end. "The recent case of Mindler v. Crocker, 245 Ala. 578, 18 So. 2d 278(8), 281, re-emphasized the principle and pointed out that there must be 'Confidential relations, accompanied with activity of a favored beneficiary in the preparation and execution of a will.' To the same effect are: Raney v. Raney, 216 Ala. 30, 112 So. 313, 316; Jones v. Brooks, supra; Coghill v. Kennedy, supra; Bancroft v. Otis, supra."

To the same effect is Hyde v. Norris, 250 Ala. 518, 35 So. (2d) 181, where the confidential relationship is required to be a dominant one. See further, and to like effect Shelton v. Gordon, 252 Ala. 187, 40 So. (2d) 95.

In Powell v. Raleigh, Mo. App., 244 S.W. (2d) 387, 390, the court stated:

"To state the matter more accurately (since the so-called presumption is in reality an inference which may or may not be drawn as the situation warrants), the established fact of a confidential or fiduciary relation and a benefaction to or in the interest of the fiduciary are insufficient, standing alone, to afford a substantial basis for an inference of the exercise of undue influence by the fiduciary in the execution of a will. On the contrary, the existence of a confidential relation is only to be regarded as supporting a charge of undue influence where, in addition to proof of such relation and of a benefaction to or in the interest of the fiduciary, there are further facts and circumstances in the case from which it can be reasonably inferred that the fiduciary was himself actively concerned in some way which caused or contributed to cause the execution of the will." The case cites numerous Missouri cases.

In Doll v. Fricke, 237 Mo. App. 1148, 171 S.W. (2d) 755, 758, the court stated:

"Mere proof of confidential relations raises no presumption of undue influence. Larkin v. Larkin, Mo.

Sup., 119 S.W. 2d 351, loc.cit. 356. To render a will invalid because of undue influence, in addition to proof of a fiduciary relation and of a benefaction to the fiduciary or in his interest, there must also be proof, direct or circumstantial, that the fiduciary was active in causing the execution of the will and that, in fact, undue influence was exerted. Pulitzer v. Chapman, 337 Mo. 298, loc.cit. 316, 85 S.W. 2d 400, loc.cit. 401; Winn v. Matthews, 235 Mo. App. 337, loc.cit. 346, 137 S.W. 2d. 632."

In Lake v. Seiffert, 410 Ill. 444, 102 N.E. (2d) 294, 296, the court stated: "Presumption of undue influence arises not from the fact of fiduciary relationship, or of the *mental condition or habits* of the testator, but from participation in procuring execution of the will. Powell v. Bechtel, 340 Ill. 330, 172 N.E. 765." (Italics supplied.) To the same effect are Powell v. Weld, 410 Ill. 198, 101 N.E. (2d) 581; Cunningham v. Dorwart, 317 Ill. 451, 148 N. E. 314.

In Swaringen v. Swanstrom, 67 Idaho 245, 175 P. (2d) 692, it was held the evidence that beneficiary of a will had been attorney for testator for ten years did not establish undue influence in the absence of evidence disclosing any pressure or urging by the beneficiary on testator to effect a will in beneficiary's favor. This seems to hold a rule like that in, for example, California. In Kiefer v. Deibel, 292 Ky. 318, 166 S.W. (2d) 430, it is held that in Kentucky, the burden to prove undue influence never shifts from the contestant even if active participation on the part of the beneficiary in procuring the will is shown. In re Aldrich's Estate, 148 Fla. 121, 3 So. (2d) 856, 858, one of the Justices stated that he was convinced that in most jurisdictions there must not alone exist confidential relations, it must further appear that the beneficiary was also active in procuring or drafting the will, although there is still considerable division of judicial opinion on the subject. This statement was apparently approved in In re

Peters' Estate, 155 Flo. 453, 20 So. (2d) 487, 491. In re Lillie's Estate, 195 Okl. 597, 159 P. (2d) 542, the court appears to agree with—at least cites with approval—28 R.C.L. 146, and the annotation in 66 A.L.R. 228 to the effect that the presumption of undue influence arises only when the beneficiary has been active in some way in procuring the will. See also In re Knutson's Will, 149 Or. 467, 476, 41 P. (2d) 793, 800; In re Estate of Andersen, 192 Or. 441, 235 P. (2d) 869, 877; In re Hill's Estate, Oregon, 256 P. (2d) 735, 751. In Gehm v. Brown, 125 Colo. 555, 245 P. (2d) 865, 869, the court stated: "The generally accepted view is that the mere existence of confidential relation between a testator and a beneficiary under his will does not raise a presumption that the beneficiary has exercised undue influence over the testator, and does not cast upon the beneficiary the burden of disproving undue influence. Those consequences follow only when the beneficiary has been actively concerned in some way with the preparation or execution of the will."

It is quite clear from an examination of the cases that the rule stated in 28 R.C.L. 146 is still the prevailing rule in at least many jurisdictions, and that rule should be applied in the case at bar. The evidence, if any, concerning the weakness of the mind of testatrix is slight and it is not at all clear that, under the circumstances in this case, the will is unnatural. Whatever rule should govern in case of stronger evidence in that connection, we can find no justification for the jury to base a presumption on the evidence in this case either in whole or in part. We think, as heretofore stated, that there is no evidence that Elmer Peterson participated in any way in procuring the will in question here, and asked Instruction B was, accordingly, properly refused.

We think we should consider another feature of the case, namely, whether the court was required to give

an instruction on the so-called presumptions in the case at all. It is held, in at least many authorities, that the so-called presumptions are but inferences of fact. In re Lillie's Estate, supra; In re Bryan's Estate, 82 Utah 390, 25 P. (2d) 602; Powell v. Raleigh, supra; 50 Mich. L.R. 756. In the late Iowa case of Olsen v. Corporation of New Melleray, 60 N.W. (2d) 832, 837, decided November 17, 1953, the court specifically stated that when an attorney, a beneficiary under a will, is active in the preparation of a will, a suspicious circumstance arises which does not, however, amount to a presumption and the weight is further governed by other circumstances. This court, speaking through Mr. Justice Kimball in Hoge v. George, 27 Wyo. 423, 450, 200 P. 96, 105, which involved a presumption of law, stated: "The phrase 'presumptions of fact' is of frequent occurrence in the books, but it is now well understood that, accurately speaking, there is no such thing as a 'presumption' of fact (4 Wigmore, Ev. § 2491), and the term should be discarded as useless and confusing. When used it can mean only inferences of fact, or mere arguments which may or may not be acted upon by the jury, who, under our system of jury trials, *need not usually be instructed in regard thereto*." (Italics supplied.)

In 2 Page on Wills, supra, § 819, p. 622, the author states:

"The so-called presumptions of undue influence which arise out of certain classes of confidential relations between the testator and the beneficiary, and in some jurisdictions, in connection with additional facts, are presumptions or inferences of fact, in most jurisdictions, and not presumptions of law. It is, therefore, not necessary and not proper to charge the jury that they must find undue influence unless the proponent has introduced evidence sufficient to rebut the presumption."

This statement of the author is fully corroborated and approved by the Ohio Court of Appeals in Board of Education v. Pendleton, 80 Ohio App. 249, 75 N.E. (2d) 182, 185, and Haley v. Dempsey, 14 Ohio App. 326, 331, 332, 333. In the latter case, fully approved in the former, the court said:

"It is claimed that where a confidential relation is established and a gift made to a person in whom confidence is reposed, and such person participates in the drafting of the will, or makes suggestions for drawing it, a presumption of fraud or undue influence arises which the proponent has the burden of proof to overthrow. The word "presumption' is to some extent an ambiguous word, and many instances are found in the decisions in fraud cases, and in will contests, where it is used in more than one sense. Presumptions may be either of fact or of law. A presumption of law is a rule of law that a particular inference shall be drawn by a court or jury from a particular circumstance. A presumption of fact is a rule of law that a fact, otherwise doubtful, may be inferred from a fact which is proved. (Lawson on Presumptive Evidence (2 ed.), 639.) This distinction is adverted to in the case of Hutson v. Hartley, 72 Ohio St. 262, 268, 269, 720, 74 N.E. 197.

"Under the Ohio law the order of probate is prima facie evidence of the due attestation, execution and validity of a will, and when the order of probate is introduced in evidence the burden of proof in respect to all of these subjects rests on the contestants of the will. * * *

"In the further progress of the trial there is no such change in the burden of proof and law as to require the court in its charge to the jury to instruct them that in respect to any particular issue or items of evidence

the burden of proof is thrown back from the contestants to the proponents.

"While it is argued here that the effect of a charge as now contended for does not affect the burden of proof, the effect of such a charge would be to require the court to instruct contradictory presumptions in respect to the same subject-matter at the same time. Hutson v. Hartley, 72 Ohio St. 262, 268, 74 N.E. 197.

"The so-called presumption of undue influence arising out of confidential relations is neither a conclusive presumption nor a presumption of law. It is a mere inference of fact which the jury may draw.

" 'While the jury may find undue influences as a fact from the fact that a beneficiary in confidential relations with testator drew the will, the court must not charge the jury as a matter of law so to find.' Page on Wills, Section 414, page 482.

\* \* \*

"It is for the jury to determine what inferences of fact are properly to be drawn from the evidence adduced at the trial."

In re Goist's Estate, 146 Neb. 1, 18 N.W. (2d) 513, 523, the court stated:

"We do not favor the giving of an instruction that purports to seek out certain evidence or to discern what inferences might be drawn therefrom, for the reason that ordinarily to do so places the court in a position of pointing out to the jury evidence, which they might consider most important and paramount to other evidence and sometimes leads to over-emphasis on parts of evidence and under-emphasis on other parts thereof."

On the other hand the Iowa Supreme Court stated in Graham v. Courtright, 180 Iowa 384, 161 N.W. 774, 781:

"Though every case submitted to the jury is upon assumption that the evidence is such that a finding either way is warrantable, yet it is advisable in a case of this kind that facts from which a finding of undue influence may be inferred shall be pointed out in charging the jury; but, if this is done, attention should also be directed to those which tend to obviate such an inference and as definitely, such as long acquaintance, obligations, if any, to the beneficiary and obligations, if any, to others, whether any secrecy was observed in inserting the clause or with reference thereto, conversations with the residuary legatee or others in the presence of testator when the will was being prepared, whether appellant then advised said legatee that he could not draw the will because of being made a beneficiary, and that testatrix had refused to have any one else do so, whether said legatee directed him to go on and prepare it, and the like."

It might be rather difficult to frame an instruction according to the statement of that case.

We do not go so far as to hold that the court would err in giving a proper instruction as to the effect of certain combination of facts. But if the so-called presumptions of fact are, as held by many authorities, but inferences, and since we have said that the jury may or may not draw such inferences, the thought has arisen in the mind of the writer, that if an instruction is given as to the effect of a combination of such facts whether it would not be more accurate to instruct the jury that if they should find a confidential relationship together with other proper facts, they *may* then draw the inference of undue influence, and that *if* they draw

such inference, then that inference should be met by evidence that would balance it. It would seem, off-hand, that if that is not true, there would be little, if any difference between presumptions of law and presumptions of fact. It may be, however, that if the inference is strong, as when a party charged with exercising undue influence takes quite an active part in procuring a will, courts might consider the inference to be drawn as being of the same dignity as a presumption of law. We leave these matters for future consideration. In the case at bar, we find no error in giving Instruction No. 9 instead of the asked Instruction No. B.

5.  Instruction as to continuity of purpose.

The codicil of 1951 confirms the will of 1944, with some minor exceptions. These exceptions are logical. For instance, in the original will she asked the executor to provide a home for Rogene Peterson, apparently in Rawlins. Values had changed between 1944 and 1951. Rogene had moved to Colorado. So the 1951 codicil gave a specific legacy to her. In the original will, C. A. Brimmer had been appointed executor. He had a claim against the testatrix for some $21,000 of which she disproved, so it was not illogical that she should provide for another executor in the codicil. Testatrix told the witness Nellie Parker many times that Elmer Peterson would have the ranch, because that was what Andy (her deceased husband) would want. In 1944 testatrix told the witness Sarah Comstock that she was going to leave everything to Elmer, and that his father was the only one who had done anything for her. In 1946 she told another witness that Elmer would get the ranch. Other witnesses testified to a similar effect.

In view of this evidence, the court gave the jury Instruction No. 17, reading as follows:

"You are instructed that if the maker of a Will shows a continuity of purpose, which indicates a settled intent or consistent state of mind on his part as to the manner of distributing his estate, such fact may be considered in determining whether or not he was in possession of a disposing mind and testamentary capacity, and was free from undue influence."

The instruction is perhaps based on a similar instruction, held to be proper, In re Hart's Estate, 107 Cal. App. (2d) 60, 67, 236 P. (2d) 884, 889, in which the instruction given was as follows:

" 'If, prior to executing his last will, a testator shows a continuity of purpose running through his former wills and codicils which indicates a settled intent or a consistent state of mind on his part as to the manner of distributing his estate, this is entitled to be considered by you in determining whether or not a testator was in possession of a disposing mind, that is, had testamentary capacity and was free from undue influence in making his last will.' " The case cites a number of other California cases. In some at least of these cited cases the testamentary capacity was not attacked as of the time when the former wills, introduced in evidence, were executed. Appellants claim that the instruction given was erroneous, since former wills of similar import as the will attacked may not be introduced in evidence except when the testamentary capacity of the testator at the time when such former wills were executed is not attacked. Counsel, aside from a number of cases, cite us to 57 Am. Jur. § 126, pp. 118, 119, where it is said: "It is generally held that where the issue in a will contest is testamentary capacity, former wills executed by the testator are admissible in evidence as proof of testamentary capacity, where they were made at a time as to which his competency is unchallenged and are in substantial conformity in respect of the provisions contained with the contested

will." Not many appellate courts have passed on the precise question here involved. The rule stated in the case of In re Hart's Estate, supra, is opposed by the Illinois decisions—the substance of which is stated in 57 Am. Jur. p. 119. In Wright v. Upson, 303 Ill. 120, 135 N.E. 209, 217, the court, citing former decisions stated: "If such former declarations and former wills were executed at a time when the testator was unquestionably of sound mind and disposing memory, they furnish very strong evidence of the soundness of mind of the testator at the time the will in question was executed, but if the soundness of mind of the testator is questionable at both times, a conclusion or presumption of soundness of mind does not naturally follow." The point in question is not free from doubt. It is, perhaps, one for expert psychologists, of whom there are probably few, if any. But if we may be permitted to enter into their field, we might venture to say that if a person was insane in say 1944 when he executed a will, it would be a marvel if he would make the same sort of will with some logical changes in 1951, unless, perchance, he was working under some insane delusion during all that time, of which there is no evidence in this case. If a human mind, not acting in a manner that is clearly freaky or clearly abnormal, acts in the same or similar manner at various stages of life toward and in connection with the same basic facts before it then, it would seem, that would be some evidence that it is rational and normal at each of these various stages, and that conclusion would seem strong in proportion to the number of times in which the same attitude of mind toward the same basic facts would be manifested, either orally or in writing. 6 Wigmore on Evidence, 3rd Ed., § 1738, discusses the question of incapacity to resist pressure (which normally would also involve the question of testamentary capacity) and the question of normality of the will's disposition at some length, hold-

ing in that connection the testator's utterances, whether prior or subsequent, may all be considered. In the note in 3 American Decisions 397, it is stated: "In case of insanity or undue influence, the evidence takes a wider range, and here the subsequent as well as the prior declarations of the testator are admissible. * * * For this purpose it (the evidence) is direct and primary. The principal fact to be established is the mental condition of the testator at the time of making his will; and for this purpose evidence of his declarations, previously and subsequently, directly bears on the question, and must be relevant and competent." See also Goodbar v. Lidikay, 136 Ind. 1, 35 N.E. 691, 43 Am. St. Rep. 296; Neel v. Potter, 40 Pa. 483; Moore v. Parks, 122 Miss. 301, 84 So. 230, 237; Waterman v. Whitney, 11 N.Y. 157, 165, 62 Am. Dec. 71; Hollingworth v. Kresge, 48 R.I. 341, 137 A. 908; Portner v. Portner's Ex'rs., 133 Va. 251, 112 S.E. 762. If such evidence is admissible, there seems to be little objection to calling attention thereto in an instruction. The will in question was not freaky or clearly abnormal. We do not think that the giving of the instruction was prejudicial particularly in view of the fact that testamentary capacity of Jarda Nelson is admitted. And in view of the fact that there was no evidence of undue influence at the time when the codicil which confirmed the will was executed, the instruction, if error at all on that point, was not prejudicial.

6. Motion for mistrial—attacking character of legatee.

Ellen Kastner on direct examination told at length about the life of herself and of her sister; that she had a husband who became an invalid—incompetent; that she had three children; that about 1940, she left Walsenburg, Colorado, and went to Rawlins, and that Jarda Nelson helped her in moving. Her testimony in the main was on the point of Jarda Nelson's suscept-

ibility of undue influence, and the fact that because of her intimate relationship with the textatrix the latter should have left her a greater legacy, and that hence the will and codicil were not a natural disposition of the property. On cross examination the following proceedings took place: "Q. And what position did you hold in Walsenburg, Colorado? A. I was Director of Welfare. Q. And were you dismissed from that job when you came to Wyoming? A. Not altogether. They were quarreling, Commissioners and different Board members were quarreling * * * . Q. And if you had had any difficulty just prior to coming to Wyoming you would have told your sister about it, would you not? A. I really never had any difficulty. The Board was fighting and going on and so I decided that I'd leave. In fact, it was a political squabble. Q. Isn't it true, Mrs. Kastner, that you were fired from your job in Walsenburg by the recommendation of a Grand Jury? A. Absolutely not, that is not true, I don't think, not that I know of. I am sure it wasn't true. The Democrats were having a fight there * * * . Q. You know nothing about a Grand Jury having recommended that you be fired? A. No. sir, I definitely did not. (Here counsel for contestees produced two documents which were marked for identification.) Q. Mrs. Kastner, handing you what has been marked for identification Contestees' Exhibits L and M, for the purpose of refreshing your recollection, I wonder if you would look at those * * *. A. That was—that might have been an article in the Denver Post but that wasn't true. Q. Was your picture in the Denver Post? A. At that time, yes. Q. And what date was that? A. March 16. Q. Did the Denver Post article quote the Grand Jury? A. Do they what? Q. Do you know whether or not the Denver Post quoted the recommendation of the Grand Jury?"

Up to this point no objection whatever was made.

Then it was objected: "If the Court please, if there are Grand Jury proceedings instituted against this witness, I don't see why counsel does not present the Grand Jury indictment instead of insinuating a bunch of articles appearing in the Denver Post. Now, I object to the insinuation, the innuendo and unless he properly shows that there was a Grand Jury indictment I move that this entire element of this case be stricken from the record." The Court: "Well, I think that's probably right." The exhibits mentioned were excluded by the court. The next morning counsel for contestants moved for a mistrial for the reason that the evidence above mentioned was introduced merely for the purpose of prejudicing the witness in the eyes of the jury. The trial court, speaking briefly, finally overruled the motion for the reason that it could not feel that the matter was prejudicial and that the objections came too late.

Counsel apparently did not consider the testimony prejudicial until the question about the Grand Jury came up the second time and then merely moved that the matter be quashed "unless he properly shows that there was a Grand Jury indictment." The question did not indicate or insinuate that. We think that counsel have exaggerated the effect of the questions. She was not accused of any crime, or of any debasing action. The discharge from employment, even if at the recommendation of the Grand Jury may be for many different reasons—the witness had explained that it was because of a political controversy, which may well be true. Counsel for contestees insists that the questions were relevant. We can readily see that in a case in which a will is contested, the character of one who claims that he or she should have been left a greater legacy may become relevant in order to determine the reason of a bequest or lack thereof left by a will to such person. Take an extreme case. Should a testator

leave something in his will to his brother known to him to be a criminal at the risk that his testamentary provisions be broken? We doubt it. And so we are in doubt as to whether or not to condemn the questions here involved, at least too severely, since it is not unlikely that the decedent knew about the facts, may have blamed her sister and took that into consideration in making her will. We do not however think that the questions subserved any good purpose, but counsel for contestants should have been more alert and should have objected sooner and when she was asked whether she was discharged or at least at the time when the first question referring to the Grand Jury was asked and before the matter of the Denver Post was mentioned. They wax rather eloquently indignant that an attempt should have been made to besmirch the character of Ellen Kastner, with three children and an invalid husband. However, if that can be so regarded, it must be remembered that no one likes it, even if that is done after one has been laid away in the grave, and we cannot altogether ignore the fact that Ellen Kastner was the one who cast the first stone. We might mention other reasons why it was not prejudicial to overrule the motion for a mistrial, but they need not be mentioned.

7. Comments of the court on the evidence.

Dr. Rymer, a psychiatrist from Denver was called as a witness by the contestants to answer hypothetical questions. He had not seen testatrix. After showing his qualifications he was asked a long hypothetical question based substantially on the facts outlined as stated by counsel for contestants. That question was not answered. Reference then was made to the death certificate showing that decedent died of auricular fibrillation—a flutter of the left side of the heart. The witness stated that condition is usually associated with other findings. One would expect an increase of blood pres-

sure or hardening of the arteries, or rheumatic fever, or an increase in the function of the thyroid. The witness was then asked whether in a person 62 years of age hardening of the arteries would be likely. The answer was that it might occur in a person 55 to 65 years of age or earlier or later. Then the witness was asked how hardening of the arteries would affect the system. The answer was that it would be reflected in the increase of blood pressure—it might go to 200 in systolic and 120 diassolic. There might be a history of a stroke. One might find dizziness or spells of fainting; might find forgetfulness, changeability, irritability; the individual might suffer from error in judgment, the management of business might suffer; the person might lose the finer sensibilities; might not remember to take baths; there might be a tendency to hoard. The most important change is possibly a loss of critical control beyond what would be thought to be normal. A manifestation of an arteriosclerotic process would be a hemorrhage into the brain that might or might not result in a paralysis, and might be confined to the brain without affecting the other parts of the body. "Q. One in which there is history of a stroke and auricular fibrillation, would it fall in either category? A. Well, it would seem to be that it is a generalized type which would include the brain tissue as well." The witness then stated the exact cause of hardening of the arteries is not known and launched into an extensive description of it. "Q. What would stubbornness indicate (in the decedent)? A. I think that would simply be a part of the generalized picture of hardening of the arteries * * * Changeability would indicate inability to exercise a good control over their intellectual processes and possibly due to forgetfulness, which is a characteristic thing of the arteriosclerotic process. * * * Violent temper would indicate lack of control and exercise of critical judgment. Scheming is simply a matter of stub-

bornness. Penny pinching would indicate a tendency to hoard, or apprehension of being left without anything, not knowing perhaps her tangible resources. Lack of modesty and slovenliness might simply be due to forgetfulness. Q. Now, Doctor, are any of the things you have discussed, do they indicate any paranoia tendencies? A. Not anything other than—" Here an objection was interposed, calling for an opinion not based on the evidence. No evidence of stroke. The Court: "I think the objection is probably proper. The reference that's made by counsel is certainly not specific and the things that the Doctor has been talking about are things that he assumes might possibly have happened and there is no evidence of at all. Now, it seems to me that whenever we get down to asking opinions of this Doctor, they must be based upon what the evidence is, part of which has been given by counsel and no objection to it, part of which has been stated by the Doctor as possible and a great possibility. Now, these should be tied down. Now whatever they are you may proceed." An objection was made to these remarks. The court asked why. The answer was: "The basis of prejudice." The court stated that was not specific. Then the following question was asked: "Q. Doctor, considering the matters enumerated: Stubbornness, changeability, temper, scheming, feeling toward husband, lack of modesty, slovenliness, penny pinching, can you tell us what all those things put together in one individual, what type of person that would indicate? A. It would indicate to me that there are certain organic changes within the individual probably produced on the basis of hardening of the arteries."

It is argued that the remarks of the court were prejudicial as being a comment on the evidence. We have given a condensed version of the testimony, so that the objection may be considered in that light. It is said in

32 C.J.S. 342 that the testimony of an expert must be based on facts in evidence or assumed to be true, but generally the scope and conduct of the examination is a matter of judicial discretion. In 32 C.J.S. 345, it is said that the questions should be complete and intelligible, should not be misleading, and should not be framed as to call for speculation or conjecture. In 58 Am. Jur. 482, it is stated that "A hypothetical question should be properly framed, sufficiently specific, and clearly stated, so that the jury may know with certainty upon what state of assumed facts the expert bases his opinion." If the court attempts to exercise its discretion in connection with the conduct of the examination in such case, it is probably difficult to do so without giving the impression that it comments on the testimony, and we must bear that in mind in coming to our conclusion herein.

The objection that the court commented on the testimony was not made at the trial of the case. The court stated that the objection actually made was not sufficiently specific. So it would seem that the objection now made should have been made at that time so the court would have had an opportunity of correcting any impression to that effect which the jury might have had. The question which led up to the statement of the court above set out was not sufficiently specific just as stated by the court. For instance the doctor had mentioned the fact that auricular fibrillation might indicate an increase in the function of the thyroid, when there was no evidence of any such condition. In fact, it would seem that all the testimony as to the effect of auricular fibrillation was altogether too speculative for the reason that there was no testimony as to how long before her death the testatrix had been so afflicted. If that affliction did not arise until after her will and codicil were executed, then clearly it could have had no pos-

sible bearing on the mental condition of the testatrix. In fact if that affliction had existed in any perceptible degree at the time the codicil was signed, the testatrix would probably have complained to Dr. McNamara who was one of the witnesses to the codicil. Again, part of Dr. Rymer's testimony, too appears to have been based on the fact that the decedent had a stroke. We agree with counsel for contestees that there is no substantial evidence that she had such stroke. The doctor stated that hardening of the arteries would be reflected in the increase of blood pressure, whereas Dr. Baker testified that the blood pressure of deceased was normal at the time of her death, which hardly harmonizes with the theory of Dr. Rymer so far as the testatrix is concerned. In view of these facts, the trial judge can hardly be criticized for referring to possibilities of which there was no evidence, and of wanting the testimony "tied down."

However, the statement "and the things that the Doctor has been talking about are things that he assumes might possibly have happened and there is no evidence of at all" was, it would seem, somewhat too sweeping. The doctor had talked of other things. He answered questions as to stubbornness, changeability, violent temper, scheming and penny pinching and these factors were shown in some of the testimony of the contestants. The effect of the doctor's testimony appears to be that these factors, or some of them, were due, or probably due, to hardening of the arteries. Even that testimony was not unmixed with mere possibilities and speculation, in view of the fact that the doctor stated that hardening of the arteries is apt to be one of the concomitants of auricular fibrillation, and we have already mentioned the value of such testimony. However in part, he seems to have based his testimony on the common experience of the existence of harden-

ing of the arteries, and to that extent the testimony may be said to have been based on fact. As it seems to us, if we were to base a reversal of this case on account of the assignment of error here considered, it would have to be on account of the somewhat too sweeping nature of the foregoing statement. Would we be justified in doing so? The broadness of the statement was doubtless due to inadvertence. The rule is, as stated in 64 C.J. 95 et seq and 53 Am. Jur. 76 et seq, that the trial judge should be careful and cautious and not comment on the evidence, and in some cases the matter has given appellate courts much concern. So trial judges should bear that in mind, as they doubtless generally do. At the same time we are admonished by § 3-1705 Wyoming Compiled Statutes 1945, to disregard errors which do not affect the substantial rights of the parties. Of course, as to whether or not an error is of that nature is not always easily determined. Opinions might well differ. So the court, which has the last word, must weigh the matter with great care. We have attempted to do so.

The present case is a civil case, and the rule as to comment on the evidence should, perhaps, be more strictly enforced in a criminal case than in a civil one. It is stated in 64 C.J. 97 that a comment by a judge in the jury's presence as to what a witness has said, or of what facts evidence is introduced is not objectionable when it is correct, and that even if incorrect it is not prejudicial if not such as is calculated to influence the jury. That is not unlike the situation in this case. The jury heard the doctor's evidence. They must have known that the judge's remark above mentioned applied only partially, and so no prejudice would have resulted.

Stripping the doctor's testimony of its embellishments, its substance is, as he himself stated, that the

peculiarities indicated that there were organic changes in testatrix probably produced on the basis of hardening of the arteries. So far as we can see that does not seem to be a vital factor herein. One would expect organic changes in every individual living to be 62 years of age. In fact the doctor admitted that to be true on cross-examination. The evidence does not go to the extent, specifically at least, that the decedent had a weakened mind. The most that may be said of it seems to be that the decedent became eccentric, but does not, necessarily at least, show a weakened mind. And if that is correct, as it seems to be, then the testimony of the witness was merely cumulative of the testimony of Ellen Kastner, Effie Balenovic and Mrs. Fred Potter, and we hardly think that we would be justified in considering errors in connection with such testimony with the same gravity as when that is not true. See 64 C.J. 139, 140.

Furthermore, the testimony of the witness did not go to the fundamental question in this case, namely whether or not Elmer G. Peterson exercised undue influence over the testatrix, and in view of what we have said on that point, and in view of other matters above mentioned, we would not feel justified in reversing this case for the error here assigned. We think that whatever error there was, was not prejudicial. If not committed, the result herein would not, we think, have been any different, and a new trial would not, we are satisfied, bring about a different verdict.

The judgment of the trial court is, accordingly, affirmed.

*Affirmed.*

RINER, J., and HARNSBERGER, J., concur.