In the Matter of the ESTATE of Alfred B. WATERS.

Valda WATERS, Appellant (Proponent),

v.

Janet C. HOLKAN, et al., Appellees (Contestants).

No. 5429.

Supreme Court of Wyoming.

June 11, 1981.

---

Bryan Sharratt, Wheatland, and Sue Davidson, Cheyenne, of Urbigkit & Whitehead, P. C., signed the brief of appellant. Mr. Sharratt appeared in oral argument for appellant.

James W. Fagan of Fagan, Fagan & Clapp, Casper, signed the brief and appeared in oral argument for appellees.

Before ROSE, C. J., RAPER, THOMAS and ROONEY, JJ., and BROWN, D. J.*

BROWN, Justice.

Appellant, widow of decedent, offered the will of Alfred Waters for probate. Appellees, decedent's daughters, contested the will contending that the testator did not possess testamentary capacity at the time he executed the will and that he was acting under duress, menace, fraud or undue influence. The jury found against appellees on the issue of testamentary capacity, but found that the testator was acting under duress, menace, fraud or undue influence at the time he executed the will. We affirm.

The issues on appeal are:

1. Was the evidence sufficient to sustain the jury's verdict that the testator acted under duress, menace, fraud, or undue influence.
2. Were the trial court's instructions correct and complete.

Alfred Waters was married on March 20, 1935, to the appellees' mother, Evelyn. Alfred and Evelyn Waters were divorced in 1940, but in that same year Evelyn Waters returned to the family home where they lived together until June 1965.

A second marriage by Alfred Waters took place in 1965, which resulted in divorce in 1969. By this time, drinking had become a problem for Mr. Waters and was first noticed by his daughter, Janet Holkan, in 1961.

Alfred Waters married a third time in 1970 and was divorced in 1974. By this time drinking had become a major problem for Mr. Waters and hospitalization was required on numerous occasions. Between 1969 and the time of his death on October 15, 1978, Water's drinking problem had become serious, possibly even the cause of death.

When Alfred Waters was committed to the Wyoming State Hospital in February 1974, Janet Holkan, his daughter, was appointed guardian of his estate. Upon his release in August 1974 the medical records indicated that if Mr. Waters were to continue drinking, his chances to recover, to become functional, and to manage his life, were very poor. Mr. Waters, however, resumed drinking the day he was released from the hospital.

Mr. Waters became acquainted with appellant, Valda Waters in June 1975 when he was going to the Mental Health Center in Wheatland, Wyoming. In November 1975 Mr. Waters began proceedings to terminate the guardianship. Valda Waters was an active participant and, in fact paid for a major part of the expenses in the proceedings to terminate the guardianship. Mr.

---

* District Judge at time of oral argument. Justice of this court, effective March 26, 1981.

Waters was hospitalized in January 1976 just prior to the hearing for terminating the guardianship so that he would be "dried out" before the hearing.

Appellant and proponent of the will, Valda Waters, married Alfred B. Waters, on February 4, 1976, about a week after the termination of the guardianship. On March 18, 1976, about six weeks later, Alfred Waters signed his will, leaving all of his property to his wife and disinheriting his two daughters.

### Sufficiency of the Evidence

■ Appellant challenges the sufficiency of the jury's finding of undue influence in three respects: 1) the verdict is inconsistent with the evidence presented at trial; 2) the verdict is not supported by the evidence presented at trial; and 3) the verdict is contrary to the great weight of the evidence. We cannot agree.

The standard of review when considering the question of the sufficiency of the evidence to support a jury verdict is well established. We must begin by assuming that the evidence supporting the prevailing party is true leaving out of consideration the conflicting evidence. This evidence must also be given every favorable inference that may be fairly drawn. Furthermore, we do not evaluate the evidence but rather determine if there was substantial evidence upon which the jury could have based its decision. *Brittain v. Booth*, Wyo., 601 P.2d 532 (1979).

*In re Draper's Estate*, Wyo., 374 P.2d 425, 431 (1962), this Court stated that:

" * * * [t]he elements of undue influence are opportunity to control; a condition permitting subversion; and activity on the part of the person charged. * * * "

The proof necessary to support a finding of undue influence has also been discussed by this court. In *In re Conroy's Estate*, 29 Wyo. 62, 211 P. 96, 99 (1922), we stated:

"It is not necessary to cite authorities to sustain the proposition that undue influence, seldom susceptible of direct proof, may be established by proof of facts from which it may be fairly and reasonably inferred." Cited with approval in *In re Merrill's Estate*, 80 Wyo. 276, 341 P.2d 506, 509 (1959).

Additionally, in 79 Am.Jur.2d, Wills, § 479, p. 614, the burden of proof necessary for a finding of undue influence has been set forth as follows:

"Direct evidence is not essential to the proof of fraud or undue influence invalidating a will, and a contest on the ground of fraud or undue influence may be weighed successfully on circumstantial evidence, the contestant being entitled to the benefit of all inferences which may be reasonably and legitimately derived from established facts. * * *."

" * * * A combination of weakened mentality and unnatural bequests will warrant the submission of the issue of undue influence to the jury. * * *." 79 Am. Jur.2d, Wills, § 487, p. 619.

"The burden of proof on the issue of undue influence, which burden most courts say rests upon the contestant, is carried, in general, by a preponderance of the evidence. * * * " 79 Am.Jur.2d, Wills, § 480, p. 614.

"Most of the authorities support the view that a presumption of undue influence arises upon a showing that one who drew the will, or was otherwise active directly in preparing it or procuring its execution, obtains under the will a substantial benefit, to which he has no natural claim, or a benefit which, in amount, is out of proportion to the amounts received by other persons having an equal claim to participate in the bounty of the testator. * * " 79 Am.Jur.2d, Wills, § 429, p. 579.

" * * * But the circumstance that the condition of the mind or the body of the testator was such as to make it probable that he was not able to resist the influence of others has been held sufficient to warrant a presumption that the will was obtained by undue influence * * *." 79 Am.Jur.2d, Wills, § 434, p. 584.

"The fact that a will is unnatural, unreasonable, or unjust in its provisions is a circumstance to be considered in connec-

tion with other evidence bearing on the question whether the will is the result of undue influence. * * * " 79 Am.Jur.2d, Wills, § 437, p. 585.

In addition, as noted by the court in *Welch's Administrator v. Clifton*, 294 Ky. 514, 172 S.W.2d 221, 148 A.L.R. 1220 (1943):

"Undue influence may be proved by circumstances leading up to and attendant upon the execution of a will, which, when taken together, are convincing, notwithstanding the fact that each circumstance standing alone might be inconclusive. [Citation.]"

A review of the evidence here indicates that Mr. Waters was suffering from the ravages of alcohol; he was confused and in a weakened condition, and had been in that condition some time prior to the execution of the will. Appellant furnished the testator with a place to live, provided for some of his living expenses and gave other financial assistance. Appellant also furnished the decedent with alcohol even though she knew of the dangers involved if Mr. Waters continued to consume alcohol. In addition, throughout this period, Mr. Waters continued to require frequent hospitalization.

The jury heard considerable testimony with respect to Mr. Water's lack of testamentary capacity. The jury, however, did not think this testimony sufficient to find that Mr. Waters lacked testamentary capacity. The jury, nevertheless, could properly consider this testimony insofar as it showed a weakened mentality, and thus rendered testator susceptible to undue influence. 79 Am.Jur.2d, Wills, § 480, p. 619, supra.

The attorney who prepared the testator's will was first contacted by the appellant, Valda Waters. Appellant also accompanied Mr. Waters to the attorney's office to have the will drawn. Apparently the attorney who drew the will never talked to Mr. Waters except in the presence of appellant. It would be fair to say, therefore, that the testator was completely dependent upon Valda Waters and that he was completely under her domination at the time of the execution of the will.

We wish to make it clear that we are not holding that any one of the circumstances leading up to and attendant upon the execution of the will, standing alone, was sufficient to sustain the jury's verdict. We do find that a combination of these circumstances, together with permittable inferences, is sufficient to sustain the jury's verdict that the testator acted under due influence at the time he executed his will. *Welch's Administrator v. Clifton*, supra.

### Instructions

■ Appellant contends that the trial court erred when it refused to give her offered instruction Number 4.[1] This instruction required clear and convincing evidence to support a finding of undue influence. Once again we cannot agree.

This Court has previously determined the quantum of proof necessary in will contest cases. The burden of proof is upon the contestant to show by a preponderance of the evidence that the testator was so influenced by others that he was not a free agent in making the will. *Wood v. Wood*, 25 Wyo. 26, 164 P. 844 (1917).

A standard of proof higher than preponderance of the evidence is not required of a deed or will contestant for every claim the contestant makes. Once certain circumstances are established, the contestant is no longer saddled with a "clear proof" standard under remaining issues. *Brug v. Case*, Wyo., 600 P.2d 710 (1979).

In *Brug v. Case*, supra, this court affirmed the lower court's decision in favor of the contestant. In the case at bar the circumstances surrounding the execution of the will were such that the contestants were, as we said in the *Brug* case, "No longer saddled with a 'clear proof' standard under remaining issues." A simple prepon-

---

1. *Instruction No. 4*:
   "Clear and convincing evidence of undue influence is required to set aside the Will of Alfred B. Waters.

   "What is meant by clear and convincing evidence is that degree of proof which in your mind creates a firm belief or conviction."

derance of the evidence is sufficient for the finding of undue influence.

We further said:

" * * * [O]nce there is clear proof of suspicious circumstances, * * * a simple preponderance of the evidence will support a finding of undue influence. [Citations.]" *Brug v. Case*, supra, at p. 715.

A preponderance of the evidence under the circumstances supports the finding of undue influence and the trial court properly refused to give appellant's Instruction 4.

■ Appellant further contends that it was error for the trial judge to refuse to give her proposed Instructions 1,[2] 2,[3] and 3.[4] This court has previously held that it is not error to refuse to give a party's offered instructions that are legally correct if these legal principles are adequately covered by the instructions that were given by the court. As this Court stated in *Jeffers v. Offe*, Wyo., 598 P.2d 450, 451 (1979):

" * * * [I]t is a well-recognized rule of law that no reversible error is committed by a court's refusal to give an instruction even where it is legally correct and applicable to the issues in the case, where other instructions given embody substantially the same propositions as requested in the refused instruction. [Citations.]"

" * * * [W]e think that the court was justified in rejecting the instructions since the matters with which they dealt were adequately covered by other instructions. * * * It is well settled that a party is not prejudiced by refusal of instructions when the matter is covered by ones which are given. [Citations.]" *Zanetti Bus Lines, Inc. v. Logan*, Wyo., 400 P.2d 482, 487 (1965).

**2.** *Instruction No. 1:*
"It is not sufficient to show that a party who benefited by a Will had the motive and opportunity to exert undue influence, but there must be evidence that she did exert it and did so control the actions of the Testator, that the instrument is not really the will of the Testator."

**3.** *Instruction No. 2:*
"Wills deliberately made by persons of sound mind are not to be lightly set aside, and the

" * * * Counsel for contestee assumes that merely because a requested instruction is correct as an abstract proposition of law it is prejudicial not to give it. That is not the law. [Citation.] The court should, of course, instruct the jury on the basic fundamental rules applicable to the facts in issue, particularly if requested to do so. [Citation.] But requests for instructions which go beyond that point stand on a different footing. Unless the refusal to comply therewith is prejudicial and affects the substantial rights of the complaining party, it cannot be held to be reversible error. * * * " *Branson v. Roelofz*, 52 Wyo. 101, 70 P.2d 589, 597 (1937).

Review of Instructions 7 and 11 that were given by the trial court shows that appellant's offered Instructions 1, 2, and 3 were adequately covered. Instruction No. 7 provided:

"You are instructed that a person possessing the requisites of testamentary capacity at the time of executing his Will is not incapacitated from making a Will by old age or illness, although these are proper matters or factors to be considered in determining whether testamentary capacity existed. The courts guard jealously the right of all persons of sound and disposing mind and memory to make Wills. This includes the right to change the Will by making new Wills at any time and from time to time, and the last Will made by any person which revokes all former Wills, if made while possessing testamentary capacity, is the Will which is valid."

Instruction No. 11 provided:

undue influence which will warrant doing so must be proven to be such as destroys the free agency and thereby substitutes the will of another for that of the Testator."

**4.** *Instruction No. 3:*
"The mere showing of susceptibility to undue influence is not sufficient to invalidate a Will, but such susceptibility must be connected with evidence with actual undue influence exercised upon the Testator."

"You are instructed that a Will which is procured by undue influence may not be admitted to probate.

"Undue influence consists of acts or conduct by which the mind of the testator is overcome by the will of another person. "Mere general influence, not brought to bear on the testamentary act, is not undue influence. In order to constitute undue influence, it must be used directly to procure the Will. It must amount to coercion destroying free agency of the testator, substituting for his own another person's will and compelling the testator to make a disposition he would not otherwise have made."

These instructions adequately explained the applicable law; and therefore, the trial judge did not err in refusing to give appellant's offered instructions.

Furthermore, we cannot agree with appellant that the failure to give these proposed instructions leads to juror confusion. Appellant's attorney filed an affidavit with the district court in connection with a motion for a new trial and other relief, claiming that two jurors had approached him and expressed some confusion in answering the second special verdict. The second special verdict concerned the issue of undue influence. This verdict form was apparently drafted by appellant's counsel, and in any event, appellant's counsel did not object to the form of the verdict. Confusion, if any, as to the verdict form cannot be directly related to failure to properly instruct the jury as to the applicable law. In addition, we do not believe this voluntary communication was significant because it did not concern "extraneous prejudicial information [that] was improperly brought to the jury's attention," or the fact that "outside influ-

ence was improperly brought to bear upon any juror." Rule 606(b), W.R.E.[5]

Affirmed.

ROONEY, Justice, dissenting.

This will may have been executed while the testator was under undue influence of appellant (hereinafter referred to as wife), but the evidence of such undue influence does not exist in the record. Accordingly, I am unwilling to reverse the standard previously set by this court in previous holdings which found, often as a matter of law, that undue influence did not exist in situations in which the evidence thereof was far more persuasive than exists in this case. *In re Wilson's Estate*, Wyo., 397 P.2d 805 (1964), cert. denied on reh. from Wyoming 399 P.2d 1008 (1965); *In re Estate of Carey*, Wyo., 504 P.2d 793 (1972); *In re Draper's Estate*, Wyo., 374 P.2d 425 (1962); *In re Anderson's Estate*, 71 Wyo. 238, 255 P.2d 983 (1953); *In re Merrill's Estate*, 80 Wyo. 276, 341 P.2d 506 (1959); *In re Nelson's Estate*, 72 Wyo. 444, 266 P.2d 238 (1954).

The same evidence upon which undue influence is predicated in this case can be found in many instances wherein one spouse disposes of all of his or her property by will to the other spouse. The majority opinion recites the following under the heading of "Sufficiency of the Evidence" as the totality of the evidence upon which undue influence could be predicated: Testator-husband was an alcoholic, and his wife occasionally purchased alcoholic beverages for him. The wife provided testator-husband with a place to live and gave him financial assistance. Testator-husband required frequent hospitalization. The wife made the appointment with the lawyer to draw up the will of testator-husband, and

5. Rule 606(b), W.R.E.:

"Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received, but a juror may testify on the questions whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."

she accompanied him to the lawyer's office for such purpose. Not only does some of the foregoing have more to do with testator-husband's capacity to make a will than with undue influence, but in other sections of its opinion the majority refers to a previous guardianship of testator-husband and to "weakened mentality" which rendered him susceptible to undue influence. Both of these things are properly in the category of "capacity" to make a will as distinguished from "undue influence." And the majority opinion acknowledges that the jury found testator-husband to be competent and that a court had terminated the guardianship prior to the execution of the will.

The following is a brief analysis of the extent and pertinency of the foregoing evidence upon which the majority opinion approves a finding of undue influence:

*1. Testator-husband was an alcoholic and his wife occasionally purchased alcoholic beverages for him.* Perhaps his antics and demands were such that the purchases were the better part of valor.[1] In any event, the evidence is explicit in the fact that testator-husband was completely sober on the date and place that he made disposition of his property. He executed the will in full possession of his faculties and was not under the influence of intoxicants. There is no evidence that wife said any-

thing to him, motioned to him, partook of the conversation relative to the will, or did anything other than be present at the making and execution of it. The subscribing witnesses to the will certified in the attestation clause that testator-husband "is, in our opinion, of sound and disposing mind and memory." Such could not refer to one who was intoxicated. Two of the three subscribing witnesses[2] testified to testator-husband's sobriety at the time that the will was executed and to the fact that he appeared "normal" to them. Both were aware of his drinking propensities and of the fact that he had been a patient at the state hospital in Evanston a few months before executing the will. Both indicated a long-time acquaintance with testator-husband. They attested to his condition at the time and place of executing the will and their subsequent testimony substantiated their belief in his sound and disposing mind and in his normal actions and appearance on that date and place. Such evidence is to the effect that testator-husband's will was published with understanding and reason.

"* * * A sound and disposing memory is one which not only knows when it is disposing of property, but how to dispose of it with understanding and reason * * *."

*Young v. Ridenbaugh*, 67 Mo.Rpts. 574, 588 (1878).

---

[1] Wife testified:

"* * * I tried to help him. I did everything I could think of to keep him from drinking, to stop him. I worked with him. * * *

\* \* \* \* \* \*

"Q. Mrs. Waters, when Brownie was having the problems with alcoholism that we have talked about here, did you on some occasions feel that his need was so great that you needed to bring him alcohol that he requested you to buy or bring him?

"A. Yes, I bought him alcohol.

"Q. And I take it that you felt that this was almost an act of kindness as far as that goes?

"A. No, it wasn't. When he would need a *drink*, he would feel it badly, but I cussed, and I cried, and I bawled, and I stompted, [sic] and it done no good. He still had to have a drink no matter what I could do. All the tender-loving care there was, I couldn't keep him from drinking.

"Q. So in effect you experienced about the same thing other members of his family had experienced, didn't you?

"A. Well, I loved him.

"Q. What happened if he didn't get the drink?

"A. I don't know. I expect he would shake and have cramps and stuff like everyone else *does if they don't have something to drink.*

"I don't drink, you see. I don't know what you go through.

"Q. I am wondering what the effect was on him. Would he become belligerent and difficult to handle?

"A. I have never seen a drinking person yet who isn't belligerent when they don't get it.

"Q. Would he tend to become irascible and difficult if you would try to stop him from drinking?

"A. He could be that way whether he was drinking or not, and a lot of other people do."

[2] The third subscribing witness predeceased testator-husband.

There is no evidence whatsoever that at the time and place the will was executed testator-husband was under the influence of intoxicants, that he had been drinking, or that his drinking habits entered into the disposition made of the property in any manner or fashion. Rather, the evidence was directly to the contrary.

2. *The wife provided testator-husband with a place to live and gave him financial assistance.* It is difficult to understand how the majority opinion can refer to evidence of this nature as being an exercise of undue influence. It is something one spouse normally does for the other spouse. The majority opinion contains quotations from 79 Am.Jur.2d Wills, §§ 429, 437 and 487 which have reference to consideration of unnatural bequests or devises in wills. Any suggestion that bequests or devises to wife in this will are unnatural, unreasonable or unjust is entirely misplaced. *Testator was appellant's husband.* If there is an inference of undue influence from the mere fact of disposition of one's property to his wife, will contests are certainly going to multiply. Must a spouse forego providing his or her mate with a place to live together with financial assistance to avoid the charge of undue influence when the mate disposes of his or her property to such spouse by will?

3. *Testator-husband required frequent hospitalization.* Again, the manner in which this fact has any bearing on undue influence by wife is difficult to comprehend. This fact could be pertinent to competency in some instances, but, as already noted, the jury found testator-husband to be competent. Again, must one forego frequent hospitalization of his or her spouse to avoid the charge of undue influence when such spouse disposes of his or her property to the other spouse by will?

4. *The wife made the appointment with the lawyer to draw up the will of testator-husband, and she accompanied him to the lawyer's office for such purpose.* It is not unusual for a wife to make an appointment with a lawyer for her husband, and it is not unusual for her to accompany him to the lawyer's office when he keeps the appointment. This is not a case in which the testator is directed to the lawyer of the beneficiary by the beneficiary, as was *In re Estate of Carey*, supra. It is not even a case where the beneficiary and testator selected the lawyer from listings in the telephone directory, as was *In re Draper's Estate*, supra.[3] Rather, the lawyer who drew the will in this case had done some legal work for testator-husband on previous occasions. He testified as follows concerning his past relationship with testator-husband:

"Q. And could you explain how you came to know him and approximately when?

"A. Well, he was an old-time friend, he and his father, of my family. I suppose I met him in the bank as a bank customer, friend, sometime. I think I had known him as I look back at least, say, 15 years ago from now. I am sure before then, too, but at least by 1965.

"Q. And after that time in 1965, did you also have opportunities or occasions when you did any legal work for him?

"A. Yes, I did.

"Q. And generally what was the nature of that legal work?

"[A]. Well, I think there might have been some minor things, but in about 1968, approximately, I represented him in the sale of his ranch at Glendo, and at approximately 1972 I represented him in the sale of some lots owned by the Glendo Dam Development Company in Glendo."

He testified that he also was attorney for the estate of wife's previous husband and believed she was executrix of that estate.

He testified that testator-husband gave the directions concerning disposition of his property:

"Q. And did you discuss with him at that time, with Brownie, the terms that he was would want in this will that you were going to prepare?

"A. Yes, I asked him what he wanted in his will.

---

**3.** Undue influence was not found in either of these two cases.

"Q. And what was it that he expressed to you?

"A. He wanted a will drawn leaving his property to his wife.

"Q. All right, and did he give you any express directions as far as his two natural daughters?

"A. In the conversation—I am trying to be precise in looking back four years ago—he made it clear to me that he wanted the property left to his wife, and that there was to be no property left to his daughters."

There was absolutely no evidence that the lawyer acted under the direction of wife rather than testator-husband or that he otherwise acted improperly in connection with this matter.

Although the four foregoing items are the sum of that recited in the majority opinion as the "Sufficiency of the Evidence" upon which undue influence is founded, the following two items referred to in the majority opinion (as noted supra) require some analysis:

*Testator-husband had a "weakened mentality" which rendered him susceptible to undue influence, and testator-husband was under guardianship prior to executing the will.* The majority opinion acknowledges that the jury found testator-husband to be competent and that his guardianship was terminated by a court which found it proper to do so. He had the capacity to make the will. Susceptibility to undue influence is not enough—even if it were here present. The existence of undue influence requires more than opportunity and motive. There must be evidence that it was actually exerted.

" * * * As we said in *In re Draper's Estate*, Wyo., 374 P.2d 425, 431–432, it is not sufficient to show that a party benefited by a will had the motive and the opportunity to exert undue influence; but there must be evidence that *he did exert it* and did so control the actions of the testator that the instrument is not really the will of the testator.

"Not only did contestant fail to come forward, in connection with the motion for summary judgment, with affidavits, testimony or other evidence tending to show *specific facts* relative to actions on the part of Redle which would constitute undue influence—or from which undue influence could be inferred—but even now there is no suggestion of anything which Redle did toward the testatrix which would constitute evidence that he did in fact exert undue influence upon testatrix." (Emphasis in original.) *In re Wilson's Estate*, supra, 399 P.2d at 1009–1010.

And see *In re Nelson's Estate*, supra. And so it is in this case. There were no specific facts in evidence from which undue influence could be found or inferred. With reference to competency, not only did the jury find testator-husband to be competent, but there was no evidence from which it could find otherwise.

" ' * * * Testator must have sufficient strength and clearness of mind and memory, to know, in general, without prompting, the nature and extent of the property of which he is about to dispose, and nature of the act which he is about to perform, and the names and identity of the persons who are to be the objects of his bounty, and his relation towards them. He must have sufficient mind and memory to understand all of these facts, and to comprehend these elements in their relation to each other, and a charge, in negative form, that capacity is lacking if testator is not able to know all of these facts, is erroneous, since he lacks capacity if he is unable to understand any one of them. He must be able to appreciate the relations of these factors to one another, and to recollect the decision which he has formed.' " *In re Estate of Morton*, Wyo., 428 P.2d 725, 729 (1967), quoting from 1 Page on Wills, § 12.21, pp. 606–608 (1960).

There was no evidence that testator-husband was without knowledge of the nature and extent of his property, the identity of those who were to be the objects of his bounty and his relations to them, and the fact that he was making a testamentary disposition.

Concerning the pertinency of testator-husband's previous guardianship, the rule was enunciated in *In re Merrill's Estate*, supra, 341 P.2d at 510:

"* * * Although the record of a guardianship has been held to be competent evidence in a proceeding to determine the validity of a will, a showing of the appointment of a guardian does not make out a prima facie case of incompetency, raises no presumptions of insanity, and has often been held to be entitled to little or no weight. See 2 Page on Wills, 3 ed., § 805; Thompson on Wills, 3 ed., § 70; and generally see 94 C.J.S. Wills §§ 46, 64; 57 Am.Jur. Wills §§ 110, 135.

"' * * * An order having a guardian appointed would not necessarily be inconsistent with testamentary capacity because guardianship may only indicate an inability to manage property or business affairs. * * *' 36 Tex.L. Rev. 18.

"Most of the cases to which reference is made in these authorities are limited in the assistance they provide since they relate to cases dealing with wards who admittedly have had mental difficulties, sometimes having been found to be insane. Even in such cases, courts have been very careful to say that the adjudication in a guardianship or insanity matter is not one which can be carried over into the finding as to the validity of a will. * * *"

See *In re Estate of Carey*, supra.

The potential problem from the guardianship was recognized by testator-husband's attorney. He testified:

"Q. And who selected the witnesses that were to perform that function that day?

"A. Well, I certainly suggested to Brownie when he asked me who might be good witnesses, I suggested both Mr. Isabell and Dr. Allison. He actually picked the witnesses, but I suggested them.

"Q. And what were your reasons for selecting those particular witnesses?

"A. Mr. Isabell was a friend of Mr. Waters as well as a friend of mine, business associate of mine. He had dealt with Mr. Waters over the years as I had. I think he would—I assumed that he would know Mr. Waters as well as anybody here in the Wheatland community, and, of course, Dr. Allison, knowing somewhere along the line when I got the word from Mr. Waters and Brownie as everybody called him, that he wanted me to draw a will for him, I had no doubts in my own mind as to the clearheadedness and mental capacity, but nevertheless I knew that he had been in Evanston not too long before, so I went over to call on Dr. Allison. I picked Dr. Allison. I really at the time thought he was the family physician of the Waters. To the best of my knowledge that's still true. So to confirm my own opinion—I had no doubts on my opinion, but nevertheless under the circumstances I talked to Dr. Allison, and then why after I met with Mr. Waters, of course, Dr. Allison was selected as a witness to the will."

He testified that he had talked to Dr. Allison before drafting the will:

"Q. Do you remember what the nature of the conversation was?

"A. I would have to paraphrase in my own words. I went to see Dr. Allison, indicated to him that I was going to draw a will or going to be asked to draw a will for Brownie Waters and you remember things that are important. I went ahead and said as far as I can see he has no problem. In think he is okay, but I realize he was in Evanston a month ago, and I think you are the family physician, and I would appreciate your opinion as to what you think of Brownie and the opinion to properly write that will.

"Q. And did you get any indication from Dr. Allison that he was not in a capacity to execute his will?

"A. Dr. Allison seemed to feel just as I did. All I can say was in his opinion, as in mine, that there was no problem. Brownie knew what he was doing, and he could see no problem about writing a will."

The majority opinion emphasizes that its holding is based on all four of the evidentia-

ry items set forth in it. But, taken together, I believe they are not sufficient as a matter of law to establish undue influence. Certainly, the furnishing of a place to live and financial assistance to a husband who requires frequent hospitalization cannot add much weight in favor of undue influence. If anything, these items should weigh on the other side. Calling a lawyer for an appointment for one's husband and accompanying him to the lawyer's office for the purpose of making a will, coupled with occasionally furnishing him alcoholic beverages knowing that he is an alcoholic are extremely flimsy and questionable items upon which to find undue influence.

In 1916, this court set forth its view relative to undue influence:

"* * * The question is not whether this will is such a one as a juror, the district court, or this court is of the opinion the testator should have made under the circumstances; but was it the will of Josiah Cook at the time and was it his desire that his property should be disposed of after his death as therein bequeathed and devised? Wills deliberately made by persons of sound mind *are not to be lightly set aside,* and the undue influence which will warrant doing so must be proven to be such as destroys the free agency and thereby substitutes the will of another for that of the testator. * * *" (Emphasis added.) *Cook v. Bolduc,* 24 Wyo. 281, 291, 157 p. 580, 581–582, reh. denied 24 Wyo. 281, 158 p. 266 (1916).

The view was reiterated in *In re Lane's Estate,* 50 Wyo., 119, 58 P.2d 415, reh. denied 50 Wyo. 119, 60 P.2d 360 (1936); *In re Anderson's Estate,* supra; *In re Nelson's Estate,* supra; *In re Merrill's Estate,* supra; *In re Draper's Estate,* supra. Testator-husband's free agency was adequately established by the testimony of the subscribing witnesses. There is literally no substantial evidence that it did not exist.

The majority opinion points to the accepted proposition that undue influence may be founded on circumstantial evidence and "'* * * proof of facts from which it may be fairly and reasonably inferred.'" But the skimpy facts relied upon in this case for the purpose of applying this proposition will not suffice.

"'It is true that all evidence favorable to the party adverse to the motion must be regarded by the court in the disposition thereof and also all reasonable inferences which may be deduced therefrom. *But the inferences must be reasonable and legitimate. They cannot be strained or the result of mere conjecture or surmise. * * *'"* (Emphasis added.) *In re Draper's Estate,* supra, 374 P.2d at 427, quoting from *In re Lane's Estate,* supra, 60 P.2d at 363.

I submit that there was absolutely no evidence of undue influence by wife over testator-husband and that inferring such from the fact that she gave him occasional alcoholic beverages, knowing him to be an alcoholic; the fact that she called his lawyer for an appointment to make a will and accompanied him to the lawyer's office; from the fact that she furnished him a home and financial help; and from the fact that he required frequent hospitalization—taking all these facts together—is not fair and reasonable but amounts to a strained result premised on conjecture and surmise.

Finally, the foregoing would negate the reasoning of the majority opinion concerning the instructions and the application to this case of the language of *Brug v. Case,* Wyo., 600 P.2d 710 (1979). Testator-husband was not here in a weakened physical condition and on his deathbed when the instrument was executed—as was the grantor in the *Brug* case. Testator-husband had *not* given wife a power of attorney—as was done in the *Brug* case. There is not a scintilla of evidence that wife was actively involved in obtaining a bequest and devise to her of all of testator-husband's property (other than doing those things normally done by a wife for her husband)—as existed in the *Brug* case. The "clear proof of suspicious circumstances" which existed in the *Brug* case are not here present. Accordingly, the standard for supporting a finding of undue influence may not have

been one of a preponderance of the evidence.

I would reverse.